826 S.W.2d 890 (1992)
In the Interest of M.J.A. and C.L.A.
Perry W. EPPERLY, Chief Juvenile Officer of Greene County, Respondent,
v.
D.D., a/k/a D.A., a/k/a D.H., Appellant.
No. 17664.
Missouri Court of Appeals, Southern District, Division Two.
March 25, 1992.
*891 Karenanne Miller, Springfield, for appellant.
Lisa A. Ghan, Greggory D. Groves, Lowther, Johnson, Joyner, Lowther, Cully & Housley, Springfield, for respondent.
SHRUM, Presiding Judge.
The juvenile court ordered termination of the mother's parental rights to her sons, M.J.A., born January 24, 1983, and C.L.A., born February 14, 1985. On appeal, the mother challenges the sufficiency of the evidence to support the court's findings that she abandoned and neglected her sons, that she had demonstrated disinterest in and lack of commitment to them, and that the provision of services would not bring about lasting parental adjustment. We conclude the evidence supports the juvenile court's findings and we affirm the judgment.[1]

FACTS
The juvenile office assumed protective custody of M.J.A. and C.L.A. on May 31, 1990. At a jurisdictional hearing on July 11, 1990, the juvenile court adjudicated the boys to be neglected. A petition to terminate parental rights was filed December 28, 1990, and a hearing on the petition was conducted May 16, 1991, and June 6, 1991. At that hearing, the court took judicial notice of the record of the jurisdictional hearing, including the adjudication of neglect. Facts developed at the hearing on the petition to terminate, viewed in the light most favorable to the judgment, follow.
M.J.A. and C.L.A. were taken into protective custody after the children's maternal grandmother, Betty G., notified officials of the Division of Family Services (DFS) and the juvenile office that she had physical custody of the boys but was unable to care for them.
At the hearing, Betty explained how she came to have custody of the children. She and her husband, whose permanent residence is Springfield, Missouri, worked as over-the-road truck drivers. In May 1990, while they were stationed in Memphis, Tennessee, Betty was contacted by her daughter, *892 the appellant, who asked that Betty take her children. The appellant told Betty she had no food, money, or home for the children. On the night of May 25, 1990, the appellant met Betty at a truck stop in West Memphis, Arkansas, and left with her the two boys, who are the subject of this termination proceeding, and two minor daughters, A.A.F., born April 15, 1980, and A.L.H., born April 22, 1987. At the time, the appellant did not indicate to Betty that she would return for the children. Betty said the appellant told her, "she couldn't take care of them no more," and "they would be better off with me."
During the West Memphis, Arkansas, meeting, Betty wrote and the appellant signed, a statement whereby the appellant purported to "give" the four children "over to Betty [G.] for legal adoption" and leave full responsibility of the four children to Betty.
Betty said the appellant did not know where she was going after she left the children with her. Betty told the appellant, "If you leave the kids with me, don't come around these kids until they're of legal age." Betty told the appellant she could write to the children because they were old enough to write back to her.
Almost immediately, Betty realized she could not care for the children. She said she and her husband could not take the children on their over-the-road trips and that she and her husband "could not cope" with the children's "emotional problems." On May 29, 1990, Betty contacted the Greene County, Missouri, DFS, and that agency took the two boys into protective custody.[2] Betty denied that she intended, at the time the appellant left the children with her, to place them in foster care.
Betty testified that, after the West Memphis meeting, with one exception, the appellant never contacted her about the children, either in person, by letter, or by telephone. The single contact was a letter Betty received from the appellant approximately two weeks after the West Memphis meeting in which the appellant expressed sorrow that "this had to be this way" and in which she promised to send the children's birth certificates and social security cards. However, she never sent those items, and Betty testified that the letter was the last she heard from her. Betty said her last knowledge of the appellant's whereabouts came in September 1990 when a woman from a sheriff's office (apparently Cole County, Missouri) called to advise her that the appellant was in the county jail.
Anne Schubert, a deputy juvenile officer, supervised the case involving the two boys for the juvenile office beginning May 31, 1990. On June 18, 1990, she attempted to locate the appellant and obtained a Holts Summit, Missouri, address for her. Schubert learned the identity of the mother of the appellant's husband and contacted the mother by telephone on June 20, 1990, and confirmed that the appellant lived in Holts Summit. Based on the information acquired by Schubert, a summons was issued for the appellant at the Holts Summit address. Correspondence to the appellant was also sent to that address.
Over objection, Schubert testified that she had a telephone conversation on June 21, 1990, with a person she believed to be the appellant. Schubert said the caller identified herself as the appellant; asked for Schubert by name; said she obtained Schubert's name, address, and telephone number from a letter the caller had received from Greene County DFS social service worker Jim Ferguson; and that the caller "mentioned her boys."
During the conversation Schubert explained to the caller that "her children *893 were in foster care." She informed the caller of the date of the jurisdictional hearing and told her she should call Ferguson. The caller replied that she would call Ferguson.
Schubert testified that during her supervision of the case, a period of more than six months, she did not receive a request from the appellant to visit her sons and the appellant provided no support to them. Schubert recommended termination of the appellant's parental rights because of her lack of contact with the boys while they were in foster care.
Carmen Meadows, a Christian County DFS social service worker, supervised the boys while they were in foster care in that county. Meadows testified that she had no contact with the appellant during the two months the boys were under her supervision and that DFS received no support from the appellant for the boys during that time.
Ferguson, the only Greene County DFS case worker assigned to the case, testified that he had no contact with the appellant from May 31, 1990, when he was assigned the case, until May 2, 1991, two weeks before the hearing on the termination petition. Ferguson was aware of no payments by the appellant for the support of her sons.
Over objection, the court received into evidence a February 8, 1991, social summary prepared by Ferguson. In that report, Ferguson concluded that the appellant knew that the boys had been, since May 1990, in the custody of the DFS but that she had not "demonstrated any willingness or interest in parenting these two boys" and had not made "any meaningful response" to the DFS or the juvenile court. In the report, Ferguson recommended that the parental rights of the appellant be terminated, an action he believed to be "in the best interest of the children."
At the hearing, Ferguson recanted his earlier recommendation that the appellant's parental rights be terminated. He testified about his May 2, 1991, contact with the appellant, a telephone call from her.[3] The appellant asked Ferguson "what she could do to see the children." Ferguson told her she should attend a Permanency Planning Team (PPT) meeting scheduled for May 10, 1991.
The appellant attended the PPT meeting and visited her two sons. Ferguson observed the visit. At the hearing, he described as "appropriate" the appellant's response to the boys and their response to her. Ferguson said the boys "seemed very happy to see her" and "seemed very comfortable in her presence."
Ferguson then testified, "At this time I would not recommend that the termination go forward." He based this recommendation on his observations at the visit between the appellant and her sons, information he received about her recent visit in Christian County with A.A.F., and information obtained at the PPT meeting.[4]
Much of the appellant's evidence conflicted with that offered by the respondent juvenile officer. The appellant testified she signed the paper written by Betty but denied having read it before she signed it. She said she understood the term adoption to mean "you give up rights ... somebody else can take your children," but denied authorizing Betty to put the children up for adoption. She understood the statement to mean Betty could obtain medical treatment for the children and place them in school. The appellant said she had just been evicted from her home and she left the children with Betty as a temporary arrangement, until she could "get a job .... and a place to *894 live, to get on my feet," and that Betty agreed to that.
After leaving the children with Betty, the appellant wrote them "several letters" but received no response. The appellant spoke with Betty by telephone, and Betty told her "never to call there again." Betty denied her permission to visit the children and Betty's husband threatened to have her arrested "if I came down there and put one foot in his yard...."
Regarding her whereabouts, the appellant testified that after leaving the children with Betty on May 25, 1990, she stayed "with some friends for a while in Osage City and some people up in Columbia." On July 1 she moved to a mobile home in Jefferson City where she resided until September 1990 when she was arrested for passing bad checks and placed in the Cole County jail for 44 days. From the Cole County jail she was transferred to the Callaway County jail. After spending a total of two and one-half months in jail, she was placed on probation. As a condition of her release, she was required to attend financial management classes and obtain counseling.
The appellant said that while she was in jail she wrote to her children, but she believed the only child to receive her correspondence was her daughter, A.L.H., because "I got pictures [from] her."[5] The appellant said that, while in jail, she still believed her two boys were with Betty. She said the first time she became aware her sons were in foster care was on April 22, 1991, when she was served a summons and notice in the termination action.[6]
The appellant testified that since January 1, 1991, she had been living in a one bedroom apartment in Jefferson City. She began working for the Jefferson City Manor Nursing Home in December 1990 and worked there until April 4, 1991, when she was "terminated" because "I didn't make it into work one night...." As of the first day of the hearing, May 16, 1991, the appellant had been working part-time for two weeks at Heisinger's Lutheran Retirement Home. During the second day of the hearing, June 6, 1991, the appellant testified she was still working part-time at Heisinger's, where she earned $4.30 per hour, and that she had been working full-time for one week at Lincoln Nursing Home where she earned $4.40 per hour.
The appellant's former husband, Paul H.; her older daughter, A.A.F.; and the appellant's counselor, Jeff Cline, testified on her behalf. Paul lived in Jefferson City and had custody of A.L.H., his daughter by the appellant. He obtained physical custody of A.L.H. on May 28, 1990, after Betty called and "asked us if we wanted her." He was awarded legal custody of A.L.H. in a November 1990 modification of the dissolution decree. After modification of the decree, the appellant began frequent visits with A.L.H. at Paul's home. During those visits, the appellant discussed her attempts to contact her sons at Betty's home.
Daughter A.A.F., age 11 at the hearing, testified that she lived with Betty from May 28, 1990, until November 1, 1990, and that during that period the appellant made "about two or three" telephone calls to Betty. A.A.F. heard Betty tell the appellant "not to call back ever again and ... never to come and that [Betty] doesn't want ... my mom to see the kids...."
Cline testified that the appellant was referred to his office by her probation officer. The appellant's first appointment was on November 29, 1990, and, as of June 6, 1991, she continued to see him for counseling.
Cline said the appellant had fulfilled four treatment goals: abstain from alcohol and other drugs, fulfill her legal requirements concerning the bad checks, establish a stable financial environment, and develop a *895 stable relationship with a nonabusive person. Cline described the appellant's prognosis as "very good." Cline explained that "[i]n the last few weeks of her treatment we have discussed a number of issues which are going to impact on her ability to take care of her family and establish herself."
At her April 9, 1991, appointment, the appellant told Cline that she had received a letter in February advising her that her sons were in foster care. At prior counseling sessions, the appellant had told Cline she believed her sons were with Betty.
The guardian ad litem for the two boys recommended to the juvenile court that the appellant's parental rights be terminated because such action would be in the boys' best interests.
In its order terminating the appellant's parental rights, the juvenile court published findings of fact that closely tracked the language of § 211.447.2(1)(b) (abandonment) and § 211.447.2(2)(d) (neglect).[7] In addition, the court made the following findings on four of the seven factors of § 211.447.3:[8]
(1) The appellant has "failed to maintain regular visitation or other contact" with her sons;
(2) The appellant has "failed to pay for the care and maintenance of said minor children while in the custody of the Division of Family Services";
(3) "That there are no possible services available that would possibly bring about lasting parental adjustment enabling the return of said minor children to [the appellant] within an ascertainable period of time"; and
(4) The appellant has "exhibited an obvious disinterest and lack of commitment to said minor children as evidenced by her persistent absence and failure to communicate [with] or visit said minor children, Division of Family Services, or the Greene County Juvenile Court."

POINT I
This contested case is governed by § 211.447 which permits the juvenile court to terminate a parent's rights if the court "finds that termination is in the best interests of the child and when it appears by *896 clear, cogent and convincing evidence that one or more of [three] grounds for termination exist...." § 211.447.2. The juvenile court found the existence of two grounds: abandonment (§ 211.447.2(1)(b)) and neglect (§ 211.447.2(2)(d)).
Recited in its entirety, the appellant's first point on appeal states:
I. The trial court erred in ordering the termination of appellant's parental rights to her sons in that:
(1) There was not clear, cogent and convincing evidence that appellant, without good cause, left her sons without provision for parental support and without making arrangements to visit or communicate with them; and
(2) There was not clear, cogent and convincing evidence that appellant was not able to provide her sons with adequate food, clothing, shelter, education or care; because
A. Appellant, with good cause due to her circumstances at the time, made arrangements with her mother to physically care for the children until such time as appellant once again became able to do so; and
B. Appellant's mother thwarted her attempts to communicate and visit with the children by refusing her telephone calls and by threatening appellant with arrest if she attempted to visit her children; and
C. Appellant's mother never apprised appellant that she had placed appellant's sons in the care, custody, and control of the Division of Family Services and that her sons were in fact the subject matter of a juvenile court action.
Our reading of Point I is that the appellant claims, for reasons "A", "B", and "C," there is not clear, cogent, and convincing evidence to support a termination of parental rights on either ground: abandonment or neglect. We summarize the appellant's arguments thus: (1) the arrangement she made with Betty for the care of her children was temporary and appropriate under the circumstances, and, therefore, constituted support so as to preclude a finding of abandonment or neglect; (2) there could be no finding of abandonment because Betty prevented her from communicating with or visiting her sons; and (3) she did not intend to abandon her sons. We will take these arguments in the order presented after we address preliminary matters.
Standards of Proof and Review
The clear, cogent, and convincing standard of proof mandated by § 211.447.2 is consistent with the Due Process Clause of the Fourteenth Amendment which requires the state, in a parental rights termination case, to "support its allegations by at least clear and convincing evidence." Santosky v. Kramer, 455 U.S. 745, 747-48, 102 S.Ct. 1388, 1391-92, 71 L.Ed.2d 599, 603 (1982). A clear and convincing evidence standard "adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process." Id. at 769, 102 S.Ct. at 1403, 71 L.Ed.2d at 617.
The Missouri Supreme Court has stated that where the clear, cogent, and convincing evidence standard applies, "the court should be clearly convinced of the affirmative of the proposition to be proved." Grissum v. Reesman, 505 S.W.2d 81, 85-86 (Mo.1974) (emphasis in original). The Grissum court noted, "The word `cogent' adds little, if anything; it means impelling, appealing to one's reason, or convincing." Id. at 86.
In several opinions, various districts of the Missouri Court of Appeals have cited the following definition of clear and convincing evidence, drawn from In re Sedillo, 84 N.M. 10, 498 P.2d 1353, 1355 (1972):
For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.
See, e.g., Matter of O'Brien, 600 S.W.2d 695, 697 (Mo.App.1980); In the Interest of *897 J.A.J., 652 S.W.2d 745, 748 (Mo.App.1983); In the Interest of M.N.M., 681 S.W.2d 457, 459 (Mo.App.1984); In re J.D.K., 685 S.W.2d 876, 879 (Mo.App.1984). There need not be one single event that "instantly tilts the scales." J.D.K., 685 S.W.2d at 880.
Our review of a parental rights termination decree is governed by the principles set forth in Murphy v. Carron, 536 S.W.2d 30 (Mo. banc 1976). See, e.g., In re Adoption of W.B.L., 681 S.W.2d 452, 454 (Mo. banc 1984). Thus, we will affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. Murphy v. Carron, 536 S.W.2d at 32; W.B.L., 681 S.W.2d at 454.[9] In a parental rights termination case, "substantial evidence," as the term is used in Murphy v. Carron, means "clear, cogent, and convincing evidence." O'Brien, 600 S.W.2d at 698.
The "clear, cogent, and convincing" standard of proof may be met although the juvenile court has contrary evidence before it. W.B.L., 681 S.W.2d at 454. Moreover, evidence in the record which might have supported a different conclusion does not necessarily demonstrate that the juvenile court's determination is against the weight of the evidence. Id. Thus we give due regard to the juvenile court's opportunity to judge the credibility of witnesses. In the Interest of D.G.N., 691 S.W.2d 909, 912 (Mo. banc 1985). Where there is conflicting evidence, we review the facts in the light most favorable to the judgment. In the Interest of M.E.W., 729 S.W.2d 194, 196 (Mo. banc 1987).
Discussion and Decision
Did the arrangement made by the appellant with Betty for the care of her sons constitute sufficient support which would preclude a finding of abandonment or neglect? We hold that it did not.
Where there is good cause, because of a temporary situation, a parent may leave a child in the custody of a third party without abandoning the child. See In re Ayres, 513 S.W.2d 731, 735 (Mo.App.1974). However, this principle is limited to cases where, once the temporary placement is made, the parent continues to show parental interest and concern for the child. Id.
By contrast, when a parent, temporarily unable to support a child, leaves the child with a custodian for an extended period or on a permanent basis and, thereafter, when able to do so, makes only sporadic attempts to communicate with the child and provides only token support, the juvenile court may ignore evidence of the custodial arrangements in its determination of whether grounds for termination exist. In the Interest of H.D., 629 S.W.2d 655, 657-58 (Mo.App.1982); In the Interest of J.H.H., 662 S.W.2d 893, 896 (Mo.App.1983).
In H.D., a mother left her child in the care of another for an indefinite period. For 20 months she did not see her child and she did not disclose to the child's custodian her address or telephone number. Her communication with her child and the custodian was sparse at best, consisting of one postcard and four to ten telephone calls. The mother said she also sent a $25 money order, which the custodian said she did not receive. In affirming the juvenile court's termination of parental rights, the court of appeals rejected the argument that the mother, by securing the custodian's gratuitous promise to care for the child, provided support. The court stated:
Under appellant's theory a parent could have absolutely no contact with his *898 child, spend no money on the cost of raising his child, and take no responsibility for rearing his child and yet still not abandon his child because he first asked someone else to take care of the child. Such a theory is contrary to established definitions of abandonment.
629 S.W.2d at 658.
In J.H.H., a mother "parceled out to various family members" her three children because she and her husband were unemployed and financially unable to keep them. One child, J.H.H., was sent to his mother's aunt and uncle under an arrangement intended to be permanent but with the understanding that the mother could visit. During the next three and one-half years, the mother visited J.H.H. three times, sent him one Christmas card, "usually" sent him a birthday card, and, with the exception of one $5 birthday gift, made no financial contribution to him or his custodians. On appeal from a termination order, the mother argued that she supported J.H.H. by placing him with a relative who assumed her support obligation. The court of appeals rejected that argument, concluding "[t]here was no `temporary situation' here." 662 S.W.2d at 896. The court stated that, as was the case in H.D., "the caretaker's gratuitous promise to the mother to care for her child indefinitely is best seen as token support by the mother which the court properly ignored." Id.
The record before us contains substantial evidence to support the conclusions that the appellant's arrangement with Betty concerning the children was not a "temporary situation," that the appellant gave only token support to the boys, and that she had only sparse communication with them from the date she left the children with Betty until the hearing on the termination petition.
Betty testified that when the appellant left the children with her, she did not indicate if or when she was coming back for them, she told Betty that the children would be better off with her (Betty), and she did not tell Betty where she was going. The appellant knew Betty did not view the arrangement as temporary because Betty told her, "don't come around these kids until they're of legal age." The statement signed by the appellant in which she purported to give her four children to Betty for legal adoption and to leave full responsibility for them to Betty scarcely bespeaks a "temporary situation." The appellant's credibility concerning her claim that she did not read the statement before signing it was a matter for the juvenile court to determine. D.G.N., 691 S.W.2d at 912.
Even if the arrangement with Betty had been temporary, and other funds had been available to support the children, the appellant's duty to contribute toward their support remained. In the Interest of M.B.A., 709 S.W.2d 941, 947[4] (Mo.App. 1986). A temporary arrangement, if it indeed be temporary, "cannot serve as an excuse for an indefinite disregard" by the appellant for her children. Id. at 947[5]. Evidence of the arrangement with Betty, whatever its duration, "is best seen as token support by the [appellant] which the [juvenile] court properly ignored." J.H.H., 662 S.W.2d at 896.
Other than the custodial arrangement made by the appellant with Betty (which the juvenile court properly could have ignored), the record reveals that the appellant's support efforts after May 1990 were non-existent. Although she asserts that she believed from May 1990 until sometime in the late winter or early spring of 1991 that her sons were with Betty, she points to no evidence that she sent, or offered to send, any support to Betty for the boys. Likewise, she points to no evidence to contradict the testimony from DFS and juvenile office employees that she provided no support for her sons.
The appellant argues that all the evidence, other than the testimony of Betty, "indicated that any failure on the part of the Appellant to provide for the care of her children was not a result of her inability to do so, but rather was a direct result of her *899 mother's actions preventing her from doing so." Even if the juvenile court accepted as true the appellant's evidence that Betty thwarted her attempts to communicate with her children, there is no evidence to support the appellant's assertion that Betty prevented her from supporting her sons.[10]
The evidence supports the juvenile court's determination that the appellant failed to support her sons.
We next examine the appellant's arguments that she was prevented by Betty from communicating with and visiting her sons. The appellant's evidence was contradicted by Betty's testimony. The appellant acknowledges the existence of evidence on both sides of the issue by stating in her brief, "The evidence reveals quite a controversy concerning whether or not Appellant was in fact able to visit and communicate with her children and whether or not Appellant failed to make arrangements to visit or communicate with her children" and "the only evidence produced at trial to support a finding that the Appellant had repeatedly or continuously failed to provide care for her children was through the testimony of [Betty]." Although the latter statement is not correct (there is evidence other than Betty's testimony about non-support), it is a recognition of the existence of such evidence.
We defer to the juvenile court's opportunity to assess the credibility of the witnesses. D.G.N., 691 S.W.2d at 912. We review the facts in the light favorable to the judgment. M.E.W., 729 S.W.2d at 196. Betty's testimony alone supports a conclusion that she did not thwart the appellant's efforts to communicate with and visit her children.
We turn now to the appellant's argument that she did not intend to abandon her two sons.[11] The necessity of a showing of intent is made clear by the definition of abandonment as it relates to an action to terminate parental rights. The court in In the Interest of Baby Girl W., 728 S.W.2d 545 (Mo.App.1987), restated various judicial definitions of abandonment as follows:
It is the willful giving up of a child with the intention that the severance be of a permanent nature. It is the voluntary and intentional relinquishment of custody of the child with the intent to never again claim the rights or duties of a parent. Abandonment implies a willful positive act such as deserting the child.
Id. at 549 (citations omitted). Evidence of her intent to abandon her sons is lacking, the appellant argues, in that there was no evidence that she knew Betty had placed the boys in the care of authorities and the only evidence of her intent to sever her parental rights came from Betty.
The appellant's argument simply ignores much of the record. There was evidence the appellant left her children with Betty for an indefinite period of time; that she handed them over to Betty "for legal adoption"; that she considered her children the "full responsibility" of Betty; that she was aware as early as June 21, 1990 (the respondent's evidence), or February 1991 (the appellant's evidence) that the boys were "in foster care"; that at no time prior to May 2, 1991, did the appellant request any contact with the boys; and that at no time prior to the hearing did the appellant make or offer any financial support, although she was employed for a portion of the time in question. "Even a minimal *900 contribution evinces the parent's intent to continue the parent-child relationship." In the Interest of M.L.K., 804 S.W.2d 398, 402 (Mo.App.1991). Evidence of the intent to continue the parent-child relationship is lacking where, as here, the appellant fails to make any contribution, no matter how diminutive the amount. In Interest of M.L.K., 804 S.W.2d at 402.
The appellant's argument under Point I appears predicated on the erroneous assumption that we will conduct a de novo review in which we determine the credibility of witnesses and make independent findings of fact. As previously stated, Rule 73.01 and Murphy v. Carron forbid such a review. The record supports the juvenile court's conclusion that there was clear, cogent, and convincing evidence the appellant abandoned her sons, § 211.447.2(1)(b), and that she neglected her sons, § 211.447.2(2)(d).

POINT II
In Point II the appellant challenges the sufficiency of the evidence to support the juvenile court's findings that she was disinterested in and lacked commitment to her sons and that "there are no possible services available" that would enable a return of the boys to her within an ascertainable time.
Regarding the former finding, she points to her own testimony and that of her counselor about the changes in her life "which would be consistent with enabling her to care for her minor sons" and her testimony and that of her counselor and her former husband which "reflected appellant's stated concerns, interest and commitment to her children."
The appellant's argument focuses on her "stated concerns" for her sons and ignores her conduct. Our supreme court has stated, "It should be noted that all grounds for termination must to some extent look to past conduct. Otherwise, a parent who has... neglected a child at the time the petition is filed can always argue that since the filing of the petition he or she has reformed, such reformation usually purported to have occurred while the child is away from the parent." D.G.N., 691 S.W.2d at 912. And as the court observed in In the Interest of M.L.W., 788 S.W.2d 759 (Mo. App.1990), "Although no one can predict the future with total accuracy, patterns in the past provide vital values to the present and future. The events of the past shape the future." Id. at 762.
The appellant cannot now erase her conduct from the record by her assertions of great interest in her sons. There was evidence from which the juvenile court could have concluded the appellant knew as early as June 1990 the whereabouts of her sons. The record is replete with evidence of the appellant's disinterest in and lack of commitment to her sons from June 1990 until May 1991, just two weeks prior to the hearing. Even under the appellant's view of the facts regarding when she first learned the whereabouts of her sons, her contact with them was infrequent. Under the statute, the juvenile court was permitted to assign little or no weight to the appellant's contact with her sons. § 211.447.4.
The appellant also challenges the juvenile court's finding that "there are no possible services available" that would enable a return of the boys to her within an ascertainable time. Her argument is essentially three-fold: (1) the "additional services" language of § 211.447.3(4) presupposes that other services have been rendered, (2) no "treatment plan" exists for her, and (3) responsibility for the lack of a treatment plan lies with DFS.
The appellant presents no argument and cites no authority to support her assertion that the juvenile court's finding about the futility of "possible services" somehow establishes a requirement that there be in place a treatment plan for her. (Presumably, a treatment plan would satisfy the "other services" requirement the appellant posits.) Moreover, the appellant *901 points to no authority requiring the existence of a "treatment plan" before a juvenile court may terminate parental rights pursuant to §§ 211.447.2(1)(b) and 211.447.2(2)(d), the subsections upon which the juvenile court in this action based its termination order.[12]
Even if a plan were required, the appellant's Point II fails. There is evidence in the record that a treatment plan was prepared for the appellant but it was never implemented. There was evidence from which the juvenile court could have concluded the lack of implementation of the plan was the fault of the appellant, not DFS. The appellant cannot now shift the blame for her actionsor inactionsto the DFS. D.L. v. D.L., 798 S.W.2d 220, 223 (Mo.App.1990).
We affirm the judgment terminating the appellant's parental rights to her sons, M.J.A. and C.L.A.
FLANIGAN, C.J., and MONTGOMERY, J., concurs.
NOTES
[1] The court also terminated the parental rights of the biological father; that determination is not a subject of this appeal.
[2] Betty contacted Paul H., the appellant's former husband and father of A.L.H. to advise him of the situation. Paul met Betty in Springfield on May 28, 1990, and took his daughter to live with him. Testimony from a DFS employee and various DFS reports indicate Betty made arrangements for the older daughter, A.A.F., to live with an aunt. However, Betty's testimony suggests A.A.F. remained with her for an indeterminate period, and A.A.F. testified she lived with Betty until November 1990.
[3] On May 1, 1991, the appellant had been in Christian County visiting her daughter, A.A.F., who by that date apparently was in foster care there.
[4] Ferguson was not asked about the nature of the information he received about the appellant's visit with her daughter in Christian County or what information he received in the PPT meeting, and the information does not appear elsewhere in the record.
[5] By the time the appellant became incarcerated, A.L.H. was living with her father, Paul H., in Jefferson City.
[6] The legal file indicates the summons and notice were personally served on the appellant on March 20, 1991.
[7] All statutory references are to RSMo Supp. 1990. Section 211.447 provides, in pertinent part:

2. The juvenile court may terminate the rights of a parent to a child ... if it finds that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the following grounds for termination exist:
(1) The child has been abandoned. The court shall find that the child has been abandoned if, for a period of six months or longer for a child over one year of age ... at the time of the filing of the petition:
....
(b) The parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so;
(2) The child has been adjudicated to have been ... neglected. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:
....
(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for his physical, mental, or emotional health and development....
[8] Section 211.447.3 provides, in pertinent part:

3. When considering whether to terminate the parent-child relationship pursuant to subdivision (1), (2) or (3) of subsection 2 of this section, the court shall evaluate and make findings on the following factors, when appropriate and applicable to the case:
....
(2) The extent to which the parent has maintained regular visitation or other contact with the child;
(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;
(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;
(5) The parent's disinterest in or lack of commitment to the child....
[9] Citing In the Interest of C.S., 483 S.W.2d 790, 793 (Mo.App.1972), the mother asserts this appeal is "a de novo review" in which we are to make independent findings of fact. We note that In the Interest of C.S. was based on Rule 73.01(d), which was repealed March 29, 1974, and that the opinion predates Murphy v. Carron which makes clear that "[t]he use of the words de novo ... is no longer appropriate in appellate review of cases under Rule 73.01." 536 S.W.2d at 32[3].
[10] The appellant does not argue she was unable to provide support to her sons; indeed, she states that "any failure ... to provide for the care of her children was not a result of her inability to do so...." Thus we are not faced with the question of what amount of support would exceed token support, given her resources from the date she left her children with Betty until the hearing on the termination petition.
[11] In her point relied on, the appellant does not raise an issue concerning her intent to abandon. Thus the issue is not preserved for our review. Rule 84.04(d); Landoll by Landoll v. Dovell, 779 S.W.2d 621, 627[9] (Mo.App.1989); Nutz v. Shepherd, 490 S.W.2d 366, 372[12] (Mo.App. 1973). We review for plain error. Rule 84.13(c); In re Marriage of McCoy, 818 S.W.2d 322, 325[3] (Mo.App.1991).
[12] If we were to take the view that the court's finding about "possible services" was irrelevant to the grounds upon which it based the termination, then we would regard the finding as surplusage and not a basis for reversal.