**In re J.D.K., (a male minor).**

**No. WD35099.**

Missouri Court of Appeals,
Western District.

Dec. 11, 1984.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and Denied
Jan. 29, 1985.
Application to Transfer Denied
April 2, 1985.

Brad Grill, Kansas City, for appellant.

Douglas B. Eskridge, Kansas City, for
respondent.

Robert F. Deis, Platte City, Guardian Ad
Litem.

Before DIXON, J., Presiding and SHAN-
GLER and SOMERVILLE, JJ.

DIXON, Judge.

The natural mother appeals the trial
court's order terminating her parental
rights. The issue is the sufficiency of the
evidence.

For comprehension of the facts neces-
sary for evaluating the sole issue, a chro-
nology of the living arrangements and loca-
tion of the child must be understood. The
child was born in March, 1980. He and his
mother, Patty, lived with Mr. and Mrs. Roy
Humes in Weston, Missouri, until mid-Sep-
tember, 1980. In September, because of
arguments with the Humes and their rela-
tives, Patty and her son left the Humes'
home and moved into an apartment in Wes-
ton. The child stayed with Patty until Oc-
tober 24, 1980, when he was first placed in
foster care where he remained until Octo-
ber 23, 1981. Patty stayed in Mrs. Paula
Schnell's home in Beloit, Kansas, from No-

vember 12, 1980, to January 25, 1981. Although the record is far from clear, it appears that Patty returned to the Humes' home in January, 1981, and remained there for five months. She then moved in with Linda and Tony Allison in Leavenworth, Kansas, where she remained until mid-February, 1982, except for three or four days in January, 1982, when she again stayed with the Schnells in Beloit. The child was returned to Patty's care in October, 1981, and stayed with her in the Allison home until he was again placed in foster care in mid-February, 1982. Since then, he has not been in Patty's care.

Patty again stayed in Weston with the Humes from February 18, 1982, to March 15, 1982. She then stayed with Pat Crooks in Weston until March 29, 1982, when she moved into an apartment in Leavenworth. On May 26, 1982, Patty married Dennis Beatty, but they separated on June 15, 1982. In June, while still in Leavenworth, Patty moved in with Wesley Sutton, the child's father, by whom she subsequently became pregnant and had a second child in 1983. In July, 1982, Patty and Wesley moved to Weston but split up soon after and Patty then moved in with Kathy Rainey, a friend from Leavenworth, with whom she stayed until October, 1982. The record does not reflect Patty's whereabouts from October, 1982, to January, 1983, and a social worker testified that, during that period, her office lost track of Patty. From February, 1983, to the time of trial, Patty again lived with the Allisons in Leavenworth.

Karoline Zerger, a counselor who evaluated Patty, stated Patty had a demonstrated inability to protect her son and to provide him with a safe and secure environment. Mrs. Humes, with whom Patty and her son stayed for his first six months, stated Patty did not take good care of him; that she did not change his diapers nor feed him on time. She also stated that Patty often spanked him on his lower back and bottom to make him stop crying. Patty admitted to Mrs. Humes that she had beaten her son to the point of bruises. After leaving the Humes' home, on at least one occasion the child was left alone and unattended in the apartment for one hour. Mrs. Humes said Patty felt put-upon for having to raise a child. She did not believe Patty was capable of raising her son, even if she were in a stable environment.

Patty has a history of lack of credibility. While staying in the Humes' home, she lied about where she went when she left the home, on occasion playing truant from work. While with the Schnells she lied about her father's being ill and requiring her presence at the hospital. Patty told Mrs. Humes, Mrs. Schnell, and Tamara Hatheway, a social worker, that Linda Allison, with whom she and her son lived in late 1981 and early 1982, had beaten her up and physically abused her son by burning his face with a cigarette, hitting him, tieing his hands behind his back and then putting him in a cold shower, and possibly, breaking his arm. At trial, she said those prior statements were lies but reiterated that she was, at times, afraid of Linda Allison.

When the child was placed in foster care for the second time in 1982, the service agreement into which Patty entered provided for monthly visits with her son. During the last six months of 1982, Patty and the child had no contact. The record reflects the child's drastic behavioral changes in and around his mother's visits. Judith Woods, the child's foster mother, stated that when the child was placed with her for foster care, he was terrified, did not cry aloud, but whined all through the night. When picked up, he slapped adults in the face and threw his head into theirs. When his diaper was changed, he made sexually explicit gestures, accompanied by the request, "do butt". He also was terrified of the shower and for months refused to approach it. Mrs. Woods testified that, in time, the little boy's behavior became more moderate but, after each visit with his mother, those behavior patterns returned

and only subsided after at least one week. During the emotional and tense visits, the child one time spit at his mother and she spit back, he became frightened when playing with her, and he usually acted aloof toward her unless she had presents for him. After the visits he also soiled his pants, regressing from his ordinary toilet habits. He screamed in his sleep, vomited repeatedly although he had no fever, and attacked the Woods' family dogs. In the six months when Patty did not contact her son, his behavior improved drastically but when she began to visit him in 1983, he again exhibited the same retrogressive behavior patterns. The background of the second foster care placement is as follows:

In December, 1981, because of an anonymous tip about the child's condition and the treatment he received, two social workers visited the Allison home, where Patty and the child were staying. They noted a cigarette burn on the child's face, a broken arm that allegedly had occurred when Linda Allison's niece dropped him, and bruises on his face, legs, and other parts of his body. One of the social workers stated, "... I had some, you know, concerns." These were Kansas social workers requested by Missouri authorities to undertake courtesy supervision for the Missouri court. Patty later called the other social worker and stated she was scared of Linda because Linda had beaten her and had mistreated her son. She also told Jean McNearney that she suspected Linda had broken her son's arm. Because the Missouri authorities had not heard further from the Kansas workers, the Missouri social workers contacted Kansas and when it was discovered that the mother and child had "disappeared" the second time, a Missouri court order was entered to terminate the mother's custody. The Kansas court and officers assisted the Missouri officials in regaining custody.

The child was placed in foster care with a Mrs. Woods on February 18, 1982. When he arrived at her house, his color was poor

(grey), there was a burn mark above his left eye, he was skinny, bruised across his back, bruised and pinched on his face and he had smashed toenails. Dr. Jay Kimball, who examined the little boy on February 19, 1982, found multiple bruises over the child's body, a six-month deficiency in immunizations, poor oral hygiene, a blood-caked detached toenail and a flattened growth curve, which he believed indicated long-term nutritional deprivation. Although Patty stated her son's size was due to colds he had had in the fall, Dr. Kimball stated routine viruses and childhood illnesses would not cause the extreme flattening of the growth curve. He also found no evidence of illness that would cause such a flattening. The dramatic increase in the child's growth curve just one month later suggested his nutritional status was greatly improved. Mrs. Woods stated that as soon as the child arrived in her home he began to eat ravenously but Dr. Kimball said it took over six months to make up ground lost due to the nutritional deprivation.

The trial court entered its decree in the form of extensive findings of fact and conclusions of law. The trial court found that there was clear and convincing evidence that the mother had failed to provide, on a continuing basis, for the mental, physical, and emotional well-being of the child; had failed to support the child; had failed to comply with an appropriate plan approved by the court, and further found that the mother had failed to rectify the conditions causing the transfer of custody, specifically, the mother's concern that she would harm the child and her confessed inability to care for the child. In a separate finding, the court found clear and convincing evidence that the mother had knowingly permitted others to physically and mentally injure the juvenile.

■ The parties agree that the standard of review is that of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), and that the quantum of proof requires clear and convincing evidence.

On the issue of neglect, the mother argues factually that there was evidence she

had visited with the child on several occasions. She further urges that her employment background and emotional disturbance excuse her failure to comply with the "plan" approved by the court.

As to the ground that the mother had failed, on a continuing basis, to rectify the conditions that caused the change of custody, the assertion is made that, if given more time, the mother could comply with the plan and properly care for the child.

In a similar vein, the mother attacks the trial court's finding that she permitted abuse by others, by pointing to evidence that the first complaint of abuse was determined to be unfounded upon an investigation by the Kansas social workers assigned to the case.

In making these assertions of error, the mother, of course, relies upon the evidence most favorable to her position, as scanty as it is in this record. The real thrust of the argument is directed to the burden of proof. Because there are fragments of evidence that support one or more of the mother's claims, she asserts that *Matter of O'Brien*, 600 S.W.2d 695 (Mo.App.1980), requires reversal. In citing *O'Brien*, she relies primarily on its citation, at page 697, of *In Re Sedillo*, 84 N.M. 10, 498 P.2d 1353, (1972). *Sedillo* stated the test of clear and convincing evidence in the following terms:

> For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.

498 P.2d at 1355.

That quotation, as it appears in *O'Brien*, was cited in *Matter of T.C.M.*, 651 S.W.2d 525 (Mo.App.1983), as an inner quote, without citing *Sedillo*. The *O'Brien* court held the evidence in that case satisfied neither the *Sedillo* test nor the test enunciated by our Supreme Court in *Grissum v. Reesman*, 505 S.W.2d 81, 86 (Mo.1974). The mother now argues that *O'Brien* requires that some unusual or extraordinary evidence instantly tilt the scales to provide clear and convincing evidence. The mother's argument is predicated upon the language of *Sedillo* and particularly the word "instantly." In effect, she argues that the *Sedillo* test is the standard by which Missouri courts are to judge clear and convincing evidence.

The *Sedillo* articulation of the standard of proof is evocative of some cataclysmic event or dramatic incident present in the evidence, which instantly persuades the trier of the fact. This is what the mother seizes upon and asserts is not present in the instant case. It is not helpful and may be positively mischievous, when the record demonstrates a gradual but progressive attrition of parental duty and an accretion of harm to the child in small but significant ways over a period of time, to require some such evidence to find the evidence to be clear and convincing.

It accomplishes little to attempt redefinitions of the burden of proof. It may be more helpful to consider the reasons for requiring that the evidence be clear and convincing, as opposed to the conventional preponderance of the evidence test. In *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the court held that due process required that the proof to sustain termination of parental rights be above the level denoted by the standard of preponderance of the evidence and meet at least the burden of proof of clear and convincing evidence. In its analysis, the court viewed the preponderance of the evidence test as one where the risk of error by the fact finder was borne equally by the parties. The beyond a reasonable doubt standard of the criminal law was said to virtually eliminate fact finding error against defendants and to make all or almost all of the risk of error fall upon the state. The court then concluded that the beyond reasonable doubt standard should be rejected and the intermediate standard of clear and convincing evidence be adopted as the threshold requirement of due process in such actions. The court concluded that such a standard "adequately conveys to the fact finder the level of subjective certainty about his factual conclusions necessary to satisfy due process." *Id.* at 769, 102 S.Ct. at 1403.

*Grissum v. Reesman* states the test as meaning "the court should be *clearly convinced* of the affirmative of the proposition to be proved." 505 S.W.2d at 86. The present case is such a situation. There is no event which instantly tilts the scales. The whole record demonstrates the mother's continuing inability to properly care for the child. It contains evidence permitting the inference that the child was abused on a continuing basis by others. The inescapable inference from the record is that the mother is unlikely to be able to rectify the conditions and neglect that it shows.

This record satisfies the *Grissum v. Reesman* test of affording clear and convincing proof of the affirmative of the proposition to be proved.

The decree terminating parental rights is affirmed.

All concur.