In re ESTATE OF Lewis Franklin
DAWES, deceased.

Ronnie Lewis DAWES, William
G. Dawes, and Goldie Diehl,
Plaintiffs–Respondents,

v.

Dennis Ray DAWES, Defendant–
Appellant.

No. 19015.

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 6, 1994.

Motion for Rehearing or Transfer
Denied Dec. 28, 1994.

Application to Transfer Denied
Feb. 21, 1995.

Christina L. (Mell) Kime, L. Dwayne Hackworth, Piedmont, for defendant-appellant.

G.H. Terando, Wilhoit, Edmundson, Terando & Hopkins, Poplar Bluff, for plaintiffs-respondents.

SHRUM, Judge.

Defendant appeals from the trial court's order that he deliver to the public administrator certain assets previously owned by Defendant's now deceased father. We affirm.

## FACTS

Lewis Franklin Dawes (Decedent) died August 31, 1992. Plaintiffs and Defendant are his four surviving children. In his will, Decedent named Defendant as personal representative. On November 10, 1992, Defendant filed an inventory that listed no assets other than furniture, household goods, and wearing apparel with a total value of $5,000.

On December 3, 1992, Plaintiffs filed their "Petition for Discovery of Assets," the caption of which identifies as defendant "Dennis Ray Dawes, Personal Representative of the Estate of Lewis Franklin Dawes, Deceased." In the petition Plaintiffs alleged, among other things, that Defendant had omitted estate assets from the inventory and that,

"6. [Defendant] entered into various agreements with the Decedent, prior to the Decedent's death, under which he was given and assumed, and agreed to assume, certain fiduciary responsibilities in order to cause the assets of the Decedent to be equally divided among [Plaintiffs] and [Defendant], per capita. [Defendant] now holds and claims such property, real and personal, as his own withholding it from [Plaintiffs] and the administration of the Decedent's Estate."

After receiving evidence on July 1, 1993, and briefs from the parties, the trial court ordered Defendant's removal as personal representative of the estate; appointed the public administrator of Ripley County as successor personal representative; ordered the public administrator to determine if there were other assets to be included in the estate, to "proceed as necessary to collect and administer such assets," and to file an amended inventory; and ordered Defendant to deliver to the public administrator certain specified property as well as any other assets of the estate in his possession. With its judgment, the court issued an opinion in which it stated the grounds for its decision and included findings of fact. *See* Rule 73.01(a)(3). Employing our own outlining scheme, we summarize the court's statement of grounds and findings:

(1) Disputed Assets. The court found that, prior to his death, Decedent arranged to transfer "the preponderant bulk" of his assets to Defendant, specifically:

(a) Real Estate. On January 31, 1992, Decedent executed a deed by which he conveyed two tracts of real estate to Defendant. The court found that the deed conformed to Chapter 461, RSMo Supp. 1989, Missouri's Nonprobate Transfers Law, and that the transfer had not been revoked or changed prior to Decedent's death. Thus, the court concluded, title to the realty passed to Defendant upon the death of Decedent and was not an asset of the estate.

(b) Bank Account. At an unspecified date, Decedent established a bank account in his name and Defendant's name, the balance of which was more than $29,000 as of the date of Decedent's death.[1] The

---

1. Plaintiffs filed with this court copies of their Exhibit 6, a collection of monthly bank statements pertaining to the account, which is a checking account in the names "Lewis Dawes or Dennis Dawes." It appears from the copy of the September 4, 1992, statement, which is of poor reproduction quality, that the account balance three days prior to Lewis Dawes's death was

court concluded that, pursuant to § 362.470, RSMo 1986, the account was a joint tenancy that became the "sole property" of Defendant upon the death of Decedent and was not an asset of the estate.

(c) Promissory Note. On October 29, 1991, Dusty Lee Holland and Vivian Aden Holland executed a promissory note, in the amount of $13,750 and secured by a deed of trust on real estate, in which they agreed to pay $400 a month to Decedent and, on his death, to Defendant. The court concluded that the note became the "separate property" of Defendant upon the death of Decedent and was not an asset of the estate.

(d) Motor Vehicle. A certificate of ownership to a 1986 Chevrolet automobile, issued February 13, 1992, names as owner "Dawes Lewis TOD Dawes Dennis." The court concluded, in effect, that title to the automobile was transferred to Defendant upon the death of Decedent. *See* § 301.681, RSMo Supp.1987.[2]

(e) Other Assets. The court found that various household and shop items, which were assets of the estate, were sold at auction on December 3, 1992. The court concluded that the proceeds of the sale were assets of the estate. The court found that, prior to his death, Decedent transferred to Defendant other items of personal property, including firearms and an air compressor, that apparently were not sold at auction.

(2) The court found that Decedent intended that Defendant take title to and possession of the disputed assets "for the equal benefit of his sister and his brothers, as well as himself...."

(3) The court found that Decedent made and signed a list of 13 items at pages 19, 21, and 23 of a ledger book and that a fair

reading of those 13 items "clearly indicates [they] were testamentary in nature."

(4) The court found that Defendant "knew of and accepted a fiduciary responsibility from his father when the items, or deeds or titles to [the disputed assets] were delivered to him, and that the delivery of those items, creation of the bank account, inclusion of [Defendant's] name on the deed, deed of trust, promissory note and vehicle title caused a trust to be imposed on the [disputed assets] for the benefit of [Plaintiffs and Defendant]."

(5) The court stated that it did not find that the execution of the real estate deed and the Holland note and deed of trust and the creation of the bank account were the result of fraud, duress, or undue influence on the part of Defendant; however, the court found that Decedent and Defendant "agreed to the creation of a trust for the equal benefit of all the children of decedent, and the instruments were created in furtherance of the intended trust."

(6) Because of "the actions of the decedent in creation of the trust" the court ordered "the costs of this action be assessed to the estate of the decedent...."[3]

We now review evidence that supports the trial court's findings as summarized above and evidence relevant to Defendant's points on appeal. Plaintiffs' first witness was Defendant who said the $5,000 value he placed on the inventory was an estimate. Defendant testified the property described on the inventory was what he sold at the auction; however, the record is silent about the amount and disposition of the sale proceeds.

Defendant testified about various items of personal property Decedent had given him before he died, none of which was included in the inventory or sold at the auction. Defendant was uncertain whether his father had

$27,745.17 and on the date of his death, $27,719.12. The trial court will have ample opportunity to ascertain the correct account balance.

2. Citing § 301.679.1, RSMo Supp.1987, the trial court found "that at the death of Lewis Dawes, the right to transfer title to the motor vehicle was in Dennis Dawes." We conclude that the correct statutory authority is § 301.681, RSMo Supp. 1987, and that the certificate of ownership satis-

fies the requirements of that statute for Lewis Dawes, as sole owner, to direct the Director of Revenue to transfer the certificate of ownership to Dennis Dawes upon the death of Lewis Dawes.

3. Plaintiffs do not challenge the court's assessment of costs against the estate, and we do not review the merits of the order.

given him these items "to keep or just for safekeeping."

Decedent had a burial insurance policy, the proceeds of which were paid to the funeral home. The policy was insufficient to cover the cost of the funeral, and the balance due had not been paid. Defendant admitted he had not investigated whether his father had other insurance policies, nor had he checked Decedent's tax returns to learn about any investments he might have. In short, he admitted, he "didn't take any steps" to gather all of Decedent's property.

Asked about the circumstances under which he was named grantee of the two tracts of land, joint tenant of the bank account, payee on the Holland note, and beneficiary under the Holland deed of trust, Defendant testified, "I had no idea why he [Decedent] set them up the way he set them." When Plaintiffs' counsel asked Defendant, "In fact, he told you on a number of occasions why he was doing it, didn't he, Mr. Dawes?," Defendant replied, "He said he didn't want things to go through probate."

Asked if Decedent "told you what you were supposed to do with the property he was putting in your name," Defendant answered, "No, he didn't." Plaintiffs' attorney then asked, "In fact, on one occasion didn't he call you and Ronnie [Plaintiff Ronnie Dawes] to his home to tell you what he had done with this deed, and didn't he tell you what you were supposed to do at his death with the property [that] was placed in your name?" Defendant answered, "I don't recall," although, he added, "I remember being there at his house."

Plaintiffs' counsel then showed Defendant Plaintiffs' Exhibit 5, a ledger book, and asked:

Q. Is that your dad's ledger book?

A. There was a ledger book up there.

Q. And you were shown it, weren't you?

A. You showed me a book at deposition. Yes, you did.

Q. He showed you a book when you and Ronnie went up to talk with him. He called you up there, didn't he?

A. Yes, he did.

Q. Yes, he did. He also showed you a will and he showed you this deed that's been previously marked, didn't he?

A. Yeah, but I didn't read it.

Q. Well, you told me earlier—

A. I glanced at it.

Q. —that you had thumbed through that. Do you recall telling me that?

A. Yes, I did. I told you that.

Q. And that was the ledger book that was kept by the magazine rack, wasn't it?

A. Yes, it was.

Q. In his house?

A. Uh-huh.

Plaintiffs' counsel directed Defendant's attention to page 19 of the ledger. Defendant said he did not see Decedent write any of the entries on page 19. Asked if he knew his father's handwriting, he responded, "I think so. Yes." Asked if the page 19 entries to which Plaintiffs' counsel referred were in Decedent's handwriting, Defendant said, "As far as I know." Defendant then read into the record several entries from page 19. We quote from the ledger:

"(1) 10–29–91 Bal Due from sale of the Caswell House of 13750 with Int. of 10% first payment due $400.00 Jan 8, 1992 Then $400.00 ea month till paid in full.

Dennis Dawes is on Deed of trust In case of my death he is to continue to collect from Mr. Mrs. Holland. And he is to divide with the other bros & sister. See my receipt book also work sheet of breakdown of payments.

Lewis Dawes

I have a copy of work sheet for each of you kids.

(2) I have will and it is in a Brown Envelope in the safe.

(3) I no longer do business at the Mercantile Bank. All of my business now at Ripley Co State Bank."

Page 19 also contains the following entry, which Defendant did not read at trial:

"(5) Dennis is on checking account and he is to pay my monthly bills. I have a book in magazine rack that should help him with the payments."

Defendant admitted that Decedent had given each of the four children—Defendant and Plaintiffs—an amortization schedule for the Holland loan.

Asked if there was anything on pages 21 and 23[4] of the ledger that was not in Decedent's handwriting, Defendant said, "Not as far as I know." Defendant then read the following entries from page 21. We quote from the ledger:

"(7) On 1–31–92 I had a Beneficiary deed made for the house at 110 Sycamore. Should something happen to me Dennis can sell the property and pay Bills also divide with each of Bro & Sister Deed in safe and abstract.

(8) 1–31–92 also Beneficiary Deed made on 3 lots south of Doniphan. Again Dennis can sell + Divide with each. Dennis I have two abstracts to the lots in safe you may not need both.

. . . .

(10) 1–31–92—Tod Titles fixed for car & truck Titles will return from Jefferson City in a few days. Title for 1986 Chev car at my Death title as fixed gives Dennis the right to sell without going through probate court."

Defendant then read the three entries that appear on page 23. We quote the ledger:

"(11) 1–31–92—1976 Dodge truck a Tod title fixed and at my death truck goes to Jewel Holford Should she go first then it goes to my estate.

(12) I believe that fixing things as I have explained that it will not have to be probated in court.

(13) Personal property can be done in agreement between you all or if you wish can have sale. Then each of you can buy any item that you might want. But on everything described above expences comes first and then divide equally between each of you.

Lewis Dawes."

At the end of his direct examination, the following questioning of Defendant occurred:

"Q. Didn't your father tell you exactly what was in that book—

A. No.

Q. —and showed it to you?

A. No. He said he wrote some things in the book.

Q. Didn't he tell you that you were to divide—in the presence of at least one other brother and your sister, didn't he tell you?

A. No, not that I recall.

Q. You just don't recall?

A. I don't remember."

Defendant testified he did not intend to divide any of the disputed assets among his siblings.

Plaintiff Ronnie Dawes testified that in January 1992 he and Defendant went together to Decedent's home on which occasion Decedent showed the two of them the real estate deed and the ledger (Plaintiffs' Exhibits 4 and 5), as well as Decedent's will.[5] Ronnie Dawes said Decedent directed his remarks to "both of us." We quote from Ronnie Dawes's direct examination:

"Q. . . . He showed you the will, the deed, and the ledger, and then he asked you—

A. He asked—He asked me to read them.

Q. Okay. What about Dennis?

A. Okay. He gave me one of them and he gave Dennis the other one.

Q. Okay.

A. And when I finished mine, Dennis and I traded; and when I finished that—

Q. May the court then assume that, as a result of that process, each of you and Dennis read all three documents?

A. Yes.

Q. Okay. And then after the two of you had done that, what did he say or ask?

---

4. The pages were numbered by the ledger manufacturer, not Decedent. Pages 20 and 22 would have been on the reverse of pages 19 and 21, respectively. Presumably pages 20 and 22 were blank or contained information the parties did not deem relevant.

5. Although the will was used at trial, it was not offered into evidence and is not a part of the record on appeal.

A. He asked me if that was all right with me, and I says, 'That's fine with me. I think it'll be done right.'

Q. What did he ask of Dennis?

A. He asked Dennis if it was all right with him.

Q. Did Dennis have any complaints? Did he—

A. None.

. . . .

Q. Did he offer any explanation to you and Dennis as to why he had set things up as he had in the will and in Exhibits 4 and 5?

A. No, he didn't. He just said—He just asked me if that was the way—if that was all right with me and then asked Dennis if that was all right with him.

Q. And I take it you said that neither one of you had any objection?

A. No objections."

Ronnie Dawes said pages 19, 21, and 23 of the ledger were in his father's handwriting. On direct and cross examination he said entries 1, 7, 8, 10, and 13 were in the ledger in January 1992 when Decedent showed it to him and Defendant. He said those entries had not been altered since he first saw them.

Plaintiff Goldie Diehl testified that pages 19, 21, and 23 were in Decedent's handwriting and that no changes had been made on those pages since she first saw the ledger in April 1992 when her father showed it to her. On that occasion Decedent asked her to read pages 19, 21, and 23 and told her "he wanted everything split between the four" because "that way it will not have to go to probate."

Shortly after Decedent's death, Goldie Diehl asked Defendant about their father's will and the ledger. Defendant replied, "Dad don't have a will." Of the ledger, he told her, "I don't know nothing about it."

Plaintiff Bill Dawes identified ledger pages 19, 21, and 23 as being in Decedent's handwriting. He said his father first showed him those three pages in March or April 1992, that he had read the ledger on more than one occasion, and, since the day he first saw the ledger, no changes had been made to the entries on pages 19, 21, and 23. Bill Dawes said he was present when Goldie Diehl asked Defendant about Decedent's will and ledger and Defendant denied the existence of a will and denied knowledge of the ledger.

Bill Dawes testified that Decedent had cancer and that Decedent was aware of the diagnosis. Bill Dawes said Decedent's "first operation was in June of '91, cancer operation on his stomach."

Decedent's brother, George Dawes, testified that about six months before his death Decedent told him that Defendant was to divide "Everything. After the property was sold, he was supposed to divide it equally between the kids." George Dawes said his brother "thought Dennis would be honest with the other kids...."

Decedent's long-time friend, Ernest Beline, testified that, "around June of '92," while they were squirrel hunting, Decedent told him "he did not want none of [the] kids to be mad at him when he leaves this world.... He wanted Dennis to equalize everything he had in between each one of his brothers and his sister."

Defendant did not offer any testimony. He did, however, place into evidence the certificate of ownership to the 1986 Chevrolet, which lists the owner as "Dawes Lewis TOD Dawes Dennis."

During the course of the trial, defense counsel timely objected to admission of the ledger and all testimony concerning Decedent's statements about the ledger and his desire that the disputed assets be divided equally among his four children. At the close of trial, the court admitted into evidence the inventory prepared by Defendant; a newspaper advertisement for the auction, which included a list of items to be sold; Decedent's 1988, 1989, and 1990 income tax returns; the deed conveying the two tracts of real estate; bank statements for the disputed account; the Holland note and deed of trust; and the certificate of ownership to the Chevrolet. The court deferred its ruling on the admissibility of the ledger. In its decree, the court ruled the ledger admissible, apparently in its entirety.

## DISCUSSION AND DECISION

In his notice of appeal and in the jurisdictional statement and statement of facts portions of his brief, Defendant appears to appeal from all aspects of the trial court judgment. However, in his points relied on and arguments he limits his complaints to the trial court's orders regarding the disputed assets. He does not challenge his removal as personal representative, the appointment of the county public administrator as successor personal representative, or the duties assigned the public administrator as successor personal representative. If Defendant intended to appeal these latter matters, we deem the appeal abandoned. We limit our review to the trial court's orders concerning the disputed assets.

In his brief, Defendant raises three points. We deal initially with Point III in which he contends the trial court lacked jurisdiction to order him to deliver assets he owned individually to the public administrator because he (Defendant) was "named as a party to this suit in his capacity as personal representative of the estate and not as an individual." Defendant relies on the principle of law, "In order to obtain a binding judgment against a [personal representative of an estate] in his individual capacity ... he must be sued in his individual capacity," which principle is stated in *Barnett v. Schumacher*, 453 S.W.2d 934, 937 (Mo.1970), and reiterated in *Estate of Smith*, 767 S.W.2d 29, 34[4] (Mo. banc 1989), and *Kaplan v. Centerre Trust Co. of St. Louis*, 740 S.W.2d 711, 712[1] (Mo.App. 1987).

The error in Defendant's argument is his apparent assumption that the petition's caption alone determined the capacity in which he was sued. The cases cited by Defendant indicate otherwise. In *Barnett*, the supreme court relied on the caption and the body of the petition to determine that the defendant was being sued in his individual capacity. 453 S.W.2d at 937. In *Estate of Smith*, the supreme court reversed a money judgment entered against the personal representative as an individual at least in part because the plaintiffs' petition sought only a declaration of the balance due on a note and a declaration that the amount due was an asset of the estate; it did not seek the money judgment. 767 S.W.2d at 30 and 34[4]. In *Kaplan*, the court held that Centerre Trust Company was a defendant only in its capacity as personal representative because it was so identified, not only in the caption but also in the body of the petition. 740 S.W.2d at 712.

■ There is ample authority for the proposition that where the caption of the petition and the summons refer to a defendant solely in a capacity other than as an individual, but where the allegations in the body of the petition make clear the defendant is being sued as an individual, then that person is a defendant as an individual. *Watson v. Watson*, 562 S.W.2d 329, 331–32 (Mo. banc 1978); cases cited in footnote 2 of *Watson*, 562 S.W.2d at 332; *Jenish v. Weaver*, 676 S.W.2d 526, 526–27 (Mo.App.1984). *See also* 67A C.J.S. *Parties* § 117 at 939 (1978), where the general rule is summarized, "The character in which one is made a party to a suit, and the capacity in which a party sues or is sued, must be determined from the allegations of the pleadings, and not from its title alone."

■ In the case before us, although the caption of Plaintiffs' petition names Defendant solely in his capacity as personal representative of the estate of Decedent, the body of the petition alleges acts and omissions by Defendant as an individual, including the allegation that he "holds and claims [the disputed] property, real and personal, *as his own* withholding it from the Petitioners and the administration of the Decedent's Estate" (our emphasis). Defendant's Point III has no merit.

It is logical to rule on Defendant's Point II before we discuss his Point I challenge to the sufficiency of the evidence. In Point II Defendant challenges the admissibility into evidence of Decedent's ledger and the testimony of George Dawes, Ernest Beline, and the three plaintiffs about oral statements made by Decedent concerning disposition of the disputed assets.

In Point II(A), Defendant claims that the challenged evidence contradicted the various unambiguous documents by which the assets were transferred to him and, therefore, was

inadmissible because of the "parol evidence rule." We believe the following observations are apropos:

"A more difficult question arises where the owner of property transfers it to another person by a written instrument in which it is not stated whether the grantee is to take the property for his own benefit or is to hold it in trust. In such a case, by the unambiguous terms of the instrument the grantor's intention to transfer the legal title to the property to the grantee clearly appears, but the instrument is silent as to the disposition of the beneficial interest. The question then is whether the effect of the admission of extrinsic evidence to show that the grantor intended that the grantee should hold the property in trust for another is to vary the terms of the instrument, or is merely to supplement it with respect to a matter on which the instrument is silent and with which it does not purport to deal. It is very generally held that although the transfer was by a deed absolute in its terms, extrinsic evidence is admissible to show an intention by the grantor that the property was to be held in trust for the grantor or for a third person.[6] The courts take the view that an absolute conveyance is not to be unequivocally construed as manifesting an intention that the grantee should take the property for his own benefit, since it does not purport to show whether the grantee is to take it for his own benefit or for the benefit of someone else. Accordingly, they say that the admission of the extrinsic evidence of an intention to create a trust does not vary the terms of the written instrument but only supplements it with respect to a matter as to which the instrument is silent. A similar result has been reached where personal property is transferred by a written conveyance, such as a deed or bill of sale.[7]"

William F. Fratcher, I *Scott on Trusts* § 38 at 406–08 (4th ed. 1987) and 47 (Supp.1993) (footnotes omitted). *See also* 9 Wigmore, Evidence § 2437 at 124 (Chadbourn rev. 1981).

In the case before us, there is no issue concerning the terms of the written instruments. The challenged evidence pertains to a separate matter: whether Decedent, having arranged to transfer the disputed assets to Defendant, intended that Defendant take the property not only for his own benefit but also for the benefit of his brothers and sister.

In his reply brief, Defendant refers to the deed, the Holland note and deed of trust, and the vehicle certificate of title with its "transfer on death" language and asserts, "It is obvious from reading these transfer documents that [Defendant] was designated as the beneficiary for all intents and purposes." We reject Defendant's argument.

There is authority in Missouri for declaration of a trust—be it express, resulting, or constructive—despite a conveyance by a deed or other instrument absolute on its face. In *Platt v. Huegel*, 326 Mo. 776, 32 S.W.2d 605 (1930), the decedent executed a written assignment of corporate stock on the back of his certificate thereby transferring the stock to his wife, the defendant. *Id.* 32 S.W.2d at 606–07. The trial court admitted extrinsic evidence concerning the existence of a trust and declared the defendant to be a trustee of the corporate stock. *Id.* at 606. The supreme court relied on the extrinsic evidence and affirmed the judgment after stating the following principles of law:

"[A]n express trust may be proved not only by express declarations, but also by circumstances from which its existence may be inferred, and to this end evidence of the acts and declarations, either oral or written, of the parties, as well as the surrounding circumstances, may be admitted and considered."

32 S.W.2d at 606[2]. *See also Neal v. Drennan*, 640 S.W.2d 132 (Mo.App.1982), in which the court rejected the argument that "a resulting trust cannot arise from a deed absolute on its face which expresses a consideration." *Id.* at 136[6] (citing *James v. James*, 248 S.W.2d 623 (Mo.1952), and *Dougherty v. Duckworth*, 388 S.W.2d 870 (Mo.1965)). *See*

---

**6.** For this proposition, the author cites authority from 23 states.

**7.** For this proposition, the author cites authority from 13 states.

*also Crane v. Centerre Bank of Columbia,*
691 S.W.2d 423 (Mo.App.1985), in which the
court implicitly recognized that, upon suffi-
cient proof, a constructive trust could arise to
defeat a deed absolute on its face.

We conclude the challenged evidence, writ-
ten and oral, did not vary the terms of the
instruments by which the disputed assets
were transferred to Defendant. Rather, the
evidence supplemented those instruments
with respect to a matter on which they were
silent. The extrinsic evidence did not violate
the parol evidence rule.[8]

In Point II(B), Defendant contends the
trial court erred in admitting into evidence,
over his hearsay objections, Decedent's ledg-
er and the testimony of Ernest Beline,
George Dawes, and Plaintiffs concerning De-
cedent's oral declarations. In its decree the
court stated it had relied on the ledger in its
entirety and the testimony of Ronnie Dawes,
George Dawes, and Ernest Beline to arrive
at its finding about Decedent's "intent."

Initially, we address Plaintiffs' assertion,
made at trial and reiterated on appeal, that
the ledger and testimony about Decedent's
oral statements were properly admitted over
Defendant's hearsay objections because De-
fendant waived that objection when he intro-
duced into evidence the Chevrolet's certifi-
cate of ownership with its "transfer on
death" designation. Plaintiffs rely on
§ 491.010, RSMo 1986, which provides in
pertinent part:

"2. In any such suit, proceeding or pro-
bate matter, where one of the parties to

the contract, transaction, occurrence or
cause of action, or his agent in such mat-
ter, is dead or is shown to be incompetent,
and the adverse party or his agent testifies
with respect thereto, then any relevant
statement or statements made by the de-
ceased party or agent or by the incompe-
tent prior to his incompetency, shall not be
excluded as hearsay. . . ."

Defendant argues that § 491.010 is inappli-
cable. We agree. In *Smith v. Christopher,*
737 S.W.2d 510 (Mo.App.1987), this court
observed, "Under the plain wording of this
statute it does not make such statements
admissible unless the adverse party or his
agent *testifies.*" *Id.* at 512 (our emphasis).
Testimony and documents are separate cate-
gories of evidence. *Scheidegger v. Thomp-
son,* 174 S.W.2d 216, 219[6] (Mo.App.1943).
*See also* Black's Law Dictionary 1476 (6th ed.
1990) where *Testimonial evidence* is defined
as "Evidence elicited from a witness in con-
trast to documentary or real evidence," and
*Testimony* is defined as "Evidence given by
a competent witness under oath or affirma-
tion; as distinguished from evidence derived
from writings, and other sources."

■ Under the "plain wording" approach
we followed in *Smith,* we hold that Defen-
dant's introduction of the certificate of own-
ership did not make Decedent's oral and
written statements admissible against hear-
say objection under § 491.010.[9]

■ Some of the challenged testimony was
admissible under the "state of mind" excep-
tion to the hearsay rule. *See Ryterski v.*

8. Defendant relies on three opinions for his parol
evidence argument: *Bergmann v. Bergmann,* 740
S.W.2d 215 (Mo.App.1987); *Love Real Estate Co.
v. Lincoln American Land Limited Partnership,*
751 S.W.2d 759 (Mo.App.1988); and *Hooks v.
Spies,* 583 S.W.2d 569 (Mo.App.1979).

Defendant's case authorities do not support his
argument. In *Bergmann,* the court affirmed an
order of summary judgment, holding there was
no evidence of new consideration to support a
subsequent modification of two promissory
notes. 740 S.W.2d at 217[5]. The court ob-
served that the alleged modification was, in fact,
concurrent rather than subsequent and, there-
fore, evidence to prove modification would not
have been admissible had the issue arisen at a
trial. *Id.* at 216. In *Love Real Estate Co.,* also
involving a suit on a promissory note, the court
held the note was not ambiguous and, therefore,

the trial court did not err in excluding extrinsic
evidence that would have contradicted a literal
reading of the terms of the note. 751 S.W.2d at
762[2]. In *Hooks,* the court concluded a deed
was ambiguous in its description of land to be
conveyed and, therefore, it was appropriate for
the trial court to consider extrinsic evidence.
583 S.W.2d at 571–72[4, 5]. None of Defen-
dant's cases involves the question of whether
extrinsic evidence that a grantor intended that a
grantee hold property in trust for another vio-
lates the parol evidence rule.

9. Defendant's testimony at trial, which was over
objection and as an adverse witness, did not
operate to waive the hearsay objection. *See
Frasher v. Whitsell,* 832 S.W.2d 18, 20[6, 7] (Mo.
App.1992).

*Wilson,* 740 S.W.2d 374, 375–76 (Mo.App. 1987), and cases cited therein. *See also Platt,* 32 S.W.2d at 607[3]. The testimony of George Dawes and Ernest Beline, as well as Goldie Diehl's testimony that Decedent told her "he wanted everything split between the four" because "that way it will not have to go to probate," were relevant to show Decedent's desire to treat his four offspring equally and to demonstrate the confidence he placed in Defendant.

■ We next consider the admissibility, over hearsay objection, of Decedent's ledger and Ronnie Dawes's testimony that Decedent "asked Dennis if it was all right with him." The issue is whether Defendant, by his silence, adopted Decedent's question and the ledger. For a thorough discussion of the principle that one's silence may be construed as assent, that is, an admission of the truth of another's oral or written statement, see 4 Wigmore, Evidence §§ 1071–1073 (Chadbourn rev. 1972); 2 McCormick on Evidence § ·262 (4th ed. 1992); 31A C.J.S. Evidence §§ 294–298 (1964); and 29A Am.Jur.2d Evidence §§ 799–801, 804 (Rev.1994).

A leading case in Missouri involving application of the principles regarding adoption by silence of another's statement is *State ex rel. Tiffany v. Ellison,* 266 Mo. 604, 182 S.W. 996 (1916), in which the court stated the rule thus:

"If a statement is made in the hearing of another, in regard to facts affecting his rights, and he makes a reply wholly or partially admitting their truth, then the declaration and the reply are both admissible; the reply, because it is the act of the party, who will not be presumed to admit anything affecting his own interest, or his own rights, unless compelled to do it by the force of truth; and the declaration, because it may give meaning and effect to the reply. In some cases, where a similar declaration is made in one's hearing, and he makes no reply, it may be a tacit admission of the facts. But this depends on two facts: First, whether he hears and understands the statement, and comprehends its bearing; and, secondly, whether the truth of the facts embraced in the statement is within his own knowledge or not, whether he is in such a situation that he is at liberty to make any reply, and whether the statement is made under such circumstances, and by such persons, as naturally to call for a reply, if he did not intend to admit it. If made in the course of any judicial hearing, he could not interfere and deny the statement; it would be to charge the witness with perjury, and alike inconsistent with decorum and the rules of law. So, if the matter is of something not within his knowledge; if the statement is made by a stranger, whom he is not called on to notice; or if he is restrained by fear, by doubts of his rights, by a belief that his security will be best promoted by his silence, then no inference of assent can be drawn from that silence."

182 S.W. at 999 (quoting *Commonwealth v. Kenney,* 53 Mass. (12 Met.) 235, 237, 46 Am.Dec. 672 (1847)) (italics in *Ellison* omitted).

Defendant's argument against an adoptive admission is three-fold: he had no "duty" to speak; the trial court's ruling erroneously extended the adoptive admission concept to apply to "everything contained in the ledger"; and the evidence, if admissible, was "entitled to little or no weight."

Defendant relies on *Kelso v. C.B.K. Agronomics, Inc.,* 510 S.W.2d 709 (Mo.App.1974), for his argument that the doctrine is inapplicable because he was under no "duty" to speak. The requirement of a "duty," as the word is used in *Kelso* and other opinions,[10] appears a cryptic designation for the inquiry, as posed in *Ellison,* "whether the statement is made under such circumstances, and by such persons, as naturally to call for a reply, if he did not intend to admit it." 182 S.W. at 999 (quoting *Kenney,* 53 Mass. (12 Met.) at

---

**10.** The *Kelso* opinion does not confine its use of the word to "legal" duties. The court's use of *duty* also embraces "any social obligation to respond to the assertion made by one of the parties to the conversation." 510 S.W.2d at 729[23]. The word *duty* also is used in *Creager v. Chilson,* 453 S.W.2d 941, 944 (Mo.1970), to summarize a portion of the court's holding, and in *Ogle v. Todd,* 514 S.W.2d 38 (Mo.App.1974). The *Ogle* opinion relies on *Kelso* for its diction. 514 S.W.2d at 42[6].

237). Elsewhere, the *Ellison* court stated, "[T]he question of whether a person is called upon to make a reply is wholly dependent upon the circumstances...." 182 S.W. at 999. *Creager* offers this direction: "Matters properly considered in determining the admissibility of such statements include the relationship of the declarant to the person whose silence is alleged to constitute an admission, the circumstances under which the statement was made, and the person to whom it was addressed." 453 S.W.2d at 944[6].

In the case before us, Decedent called two of his sons, Ronnie and Defendant, to his home. Decedent had undergone surgery for stomach cancer the previous summer and he was aware of his cancer diagnosis. He showed the brothers his will, his ledger, and the real estate deed. These circumstances naturally called for a reply from Defendant when Decedent asked him if the arrangements were "all right" with him.

Under the rule as stated in *Ellison*, a finding of an admission by silence is inappropriate unless "he hears and understands the statement, and comprehends its bearing...." 182 S.W. at 999. Defendant testified the ledger was the book his father kept by his magazine rack and that certain pages were in his father's handwriting. Defendant admitted that he "thumbed through" the ledger and "glanced at" the deed when he and Ronnie were at their father's home in January 1992. Defendant also testified that, at some unspecified time, his father told him "he wrote some things in the book." This evidence supports a conclusion that Defendant understood Decedent's statement, i.e. pages 19, 21, and 23 of the ledger, and that Defendant comprehended the bearing of those pages. The trial court was free to disbelieve Defendant's repeated assertions of memory loss and his denials that he was aware of the contents of the ledger and that Decedent had informed him of his purpose in transferring the assets to him. Rule 73.01(c)(2); *Johnson v. Gregg*, 807 S.W.2d 680, 685[2] (Mo.App.1991).

We next consider Defendant's complaint that the trial court erroneously extended the adoptive admission doctrine by applying it to "everything contained in the ledger." The ledger itself is not in the legal file; Plaintiffs have filed with us 27 pages of photocopies of the ledger's cover and certain of its pages, including 19, 21, and 23, the pages identified as being in Decedent's handwriting and from which Defendant read at trial. The trial court made no reference in its decree to any entry that does not appear on page 19, 21, or 23, and we find no entry on the other ledger pages that has any bearing on the trial court's ruling concerning the disputed assets. Thus, even if admission of "everything" in the ledger was error (and we offer no opinion on the matter), the error was harmless.

■ In his final argument against applicability of the adoptive admission doctrine, Defendant reminds us that courts should consider adoptive admissions based on silence "as dangerous and to be received with caution," *Creager*, 453 S.W.2d at 944; *Whitley v. Whitley*, 778 S.W.2d 233, 237 (Mo.App.1989), and that "a tacit admission by reason of silence is considered to be weak in probative force." *Creager*, 453 S.W.2d at 943[2]. Thus, Defendant contends, the evidence is entitled to "little or no weight."

The admonitions expressed in *Creager* serve to avoid "speculation on the part of the jury in determining the weight to be accorded the statement." 453 S.W.2d at 943. The case before us was tried to the court; there was no danger of "speculation on the part of the jury." Thus the warning that the evidence was "dangerous and to be received with caution," has no direct application here.[11] We concur in the view of the late Judge Titus of this court, who said, "When, as here, an action is tried sans a jury, the trial court may properly allow wide latitude in the admission of testimony. Unlike a jury, an experienced trial judge, as we have here, can winnow testimony which is purely chaff from the true grains contained in the evidence and come by that which is to be prop-

---

11. We recognize the *Whitley* opinion invokes the "dangerous and to be received with caution" warning in a case that was tried without a jury. We note, however, that the authority for the statement in *Whitley* is drawn from appellate court opinions in cases involving jury trials.

erly considered." *McClelland v. Williamson*, 627 S.W.2d 94, 99[18] (Mo.App.1982).

We have already stated our conclusion that, upon consideration of the matters set out in *Creager*, 453 S.W.2d at 944[6], Decedent's ledger and question to Defendant were admissible because of Defendant's silence. The issue raised by Defendant's Point II(B) is admissibility, not weight.

We hold the trial court did not err in admitting into evidence, over parol evidence rule and hearsay objections, Decedent's ledger and the testimony of George Dawes, Ernest Beline, Goldie Diehl, and Ronnie Dawes about Decedent's oral statements regarding disposition of the disputed assets.

■ In Point I, Defendant contends the trial court erred in ordering him to surrender the disputed assets because the evidence was "insufficient to warrant the imposition of either a resulting or constructive trust. . . ." Although the trial court used the term *Resulting Trust* as a subdivision heading in its decree and referred to Plaintiffs' request for a declaration of a constructive or resulting trust, at no point in the decree does the court apply either "label"—*constructive* or *resulting*—to the trust it declared.[12] Moreover, the label the trial court assigned is immaterial; in a bench tried case, a judgment that reaches a correct result will not be set aside even if the trial court gives wrong or insufficient reasons for its judgment. *Boatmen's Bank of Pulaski County v. Brooks*, 869 S.W.2d 781, 784 n. 8[5] (Mo.App.1994). For reasons to be stated, we have concluded the trial court did not err in imposing a constructive trust on the disputed assets and in ordering Defendant to deliver them to the public administrator as successor personal representative.

■ Evidence to establish a constructive trust must be so clear, cogent, and convinc-

ing that it excludes from the mind of the trial court every reasonable doubt as to the existence of the trust. *Fix v. Fix*, 847 S.W.2d 762, 765[1] (Mo. banc 1993).

The Missouri Supreme Court has stated that where the clear, cogent, and convincing evidence standard applies, "the court should be *clearly convinced* of the affirmative of the proposition to be proved." *Grissum v. Reesman*, 505 S.W.2d 81, 85–86[1] (Mo.1974) (emphasis in original). "The word 'cogent' adds little, if anything; it means impelling, appealing to one's reason, or convincing." *Id.* at 86.

In several opinions, various districts of the Missouri Court of Appeals have cited the following definition of clear and convincing evidence, drawn from *In Re Sedillo*, 84 N.M. 10, 498 P.2d 1353, 1355 (1972):

> "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true."

*In the Interest of M.J.A.*, 826 S.W.2d 890, 896–97 (Mo.App.1992) (citing *Matter of O'Brien*, 600 S.W.2d 695, 697 (Mo.App.1980); *In the Interest of J.A.J.*, 652 S.W.2d 745, 748 (Mo.App.1983); *In the Interest of M.N.M.*, 681 S.W.2d 457, 459 (Mo.App.1984); and *In Re J.D.K.*, 685 S.W.2d 876, 879 (Mo.App. 1984)). However, there need not be one single event that "instantly tilts the scales." *J.D.K.*, 685 S.W.2d at 880.

The requirement of an extraordinary measure of proof is not inconsistent with our standard of review, which is governed by Rule 73.01 and *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). "Substantial evidence" and "the weight of the evidence," as those terms are used in *Murphy v. Carron*, 536 S.W.2d at 32[1], must satisfy the applicable standard of proof. *M.J.A.*, 826 S.W.2d at 897.

---

12. The trial court's decree is divided into two sections: "Facts" and "Findings and Orders." The "Facts" portion of the decree has six subdivisions, introduced by the subdivision headings "Real Estate," "Bank Account," "Promissory Note," "Motor Vehicle," "Other Assets," and "Resulting Trust." The trial court's findings summarized in this opinion as numbers (2), (3), (4), and (5) appear in the "Facts" portion of the decree following the subdivision heading "Resulting Trust." The decree states that Plaintiffs had argued to the trial court, apparently in a post-trial brief that does not appear in the record, that the trial court "should impose a constructive, or resulting trust on all, or three-quarters of the assets transferred by decedent to [Defendant]."

The trial court may be clearly convinced of the affirmative of a proposition even though it has contrary evidence before it. *Grissum,* 505 S.W.2d at 86. Moreover, evidence in the record that might have supported a different conclusion does not necessarily demonstrate that the trial court's determination is against the weight of the evidence. *M.J.A.,* 826 S.W.2d at 897[2]. Thus we give due regard to the trial court's opportunity to judge the credibility of witnesses. Rule 73.01(c)(2); *M.J.A.,* 826 S.W.2d at 897. Where there is conflicting evidence, we review the facts in the light most favorable to the judgment. *Id.* at 897[3].

In *Suhre v. Busch,* 343 Mo. 679, 123 S.W.2d 8 (1938), our supreme court said this of constructive trusts:

"[Constructive trusts] are not technical trusts and in imposing or declaring a constructive trust a court of equity merely uses the machinery of a trust to prevent fraud or provide a remedy in cases of fraud, actual or constructive, by making the person who has wrongfully acquired property, or has acquired property under such circumstances as make it inequitable for him to retain it, a trustee for the person defrauded or injured by such fraudulent or wrongful conduct. . . .

In most cases (and such seems to be a typical case of a constructive trust) the object and purpose of a court of equity in imposing a constructive trust is 'to restore to plaintiff property of which he has been unjustly deprived and to take from the defendant property the retention of which by him would result in a corresponding unjust enrichment of the defendant; in other words the effect is to prevent a loss to the plaintiff and a corresponding gain to the defendant, and to put each of them in a position in which he was before the defendant acquired the property.' . . .

It is well established that under the following circumstances a court of equity will impose a constructive trust in favor of the party deprived of property or an interest therein by the fraudulent conduct of the defendant: . . . (2) Where there is a gratuitous conveyance of property in reliance on a promise or assurance by the grantee that he will convey, dispose of or apply the property in the particular manner indicated, directed or intended by the grantor but the grantee repudiates such promise and seeks to retain the property for his own use and benefit thereby depriving the person for whose benefit the conveyance was intended of the property, which otherwise and but for the fraudulent conduct of the grantee would have been directly conveyed or devised to him or applied for his benefit, equity will impose a constructive trust in favor of the party thus deprived of the property."

123 S.W.2d at 15–17 (quoting *Restatement of Restitution* § 160, cmt. d at 643 (1936); other citations omitted). *See also Swon v. Huddleston,* 282 S.W.2d 18 (Mo.1955), in which the court pointed out there are numerous cases that base imposition of a constructive trust on a finding of fraud, actual or constructive, and other cases that rely on a theory of unjust enrichment or an unfair or wrongful holding, without proof of fraudulent intent. *Id.* at 25. The evidence in this case supports imposition of a constructive trust on the former basis, a finding of constructive fraud.

A breach of a promise to reconvey property, made during a confidential relationship and relied upon by the promisee, is sufficient to establish constructive fraud. *Swon,* 282 S.W.2d at 26[9]. There is in the record clear and convincing evidence of a promise to convey property, a confidential relationship regarding the property, and reliance by Decedent on the promise.

When Decedent called Ronnie Dawes and Defendant to his home, he showed them his will, the ledger, and the real estate deed and asked if the arrangements were "all right." Defendant's silence must be viewed as acquiescence, which had the force and effect of an express promise. *Janssen v. Christian,* 57 S.W.2d 692, 695[5] (Mo.App.1933). *Accord Fix,* 847 S.W.2d at 766[13] (citing *Strype v. Lewis,* 352 Mo. 1004, 180 S.W.2d 688, 691 (1944)); *Becker v. Schwerdtle,* 141 Cal. 386, 74 P. 1029, 1031 (1903). The trial court was the judge of Defendant's credibility, Rule 73.01(c)(2); *M.J.A.,* 826 S.W.2d at 897; *Johnson v. Gregg,* 807 S.W.2d at 685[2], and it

could have been clearly convinced of Defendant's agreement despite his denials and failures to remember. *Grissum*, 505 S.W.2d at 86.

Evidence about the arrangements to which Defendant agreed was clear and convincing. Defendant admitted his father told him "he didn't want things to go through probate." Plaintiff Goldie Diehl testified to Decedent's desire to avoid probate and that his property be "split between the four." Decedent expressed to his friend Ernest Beline his desire to treat his four children equally when he died. In his ledger, Decedent stated his intention that the proceeds of the Holland note be divided among his children, that Defendant was "on the checking account and he is to pay my monthly bills," that the two tracts of real estate be sold and the proceeds divided, that Defendant sell the automobile, and that "on everything described above expences comes first and then divide equally between each of you." We believe the phrase "everything described above" in entry (13) on page 23 refers to all 13 entries on pages 19, 21, and 23 rather than being limited to the entries on page 23. From this evidence the trial court could have been clearly convinced not only of the testamentary nature of the various property transfers, *see Fix*, 847 S.W.2d at 767[14], but also of Decedent's intention regarding division of the assets.

A confidential relationship may be inferred from the relationship between the parties with respect to the property. *Imgrund v. LaRue*, 851 S.W.2d 40, 44[7] (Mo.App.1993). Defendant was Decedent's son, a relationship that is relevant, albeit not decisive. *Kay v. Kay*, 763 S.W.2d 712, 714[3] (Mo.App.1989). The ledger provides ample evidence that Decedent placed special trust in Defendant with respect to his property. *See Miller v. Miller*, 872 S.W.2d 654, 658[4] (Mo.App.1994). Entry (1) on page 19 is evidence that Decedent trusted Defendant to collect loan payments from the Hollands and divide them among himself and his brothers and sister. Entry (5) on the same ledger

page shows Decedent's faith in Defendant to handle his financial affairs. *Compare Keller v. Collison*, 395 S.W.2d 729, 736[8] (Mo.App. 1965).[13] Entries (7) and (8) on page 21 of the ledger demonstrate Decedent's trust in Defendant to sell the real estate and divide the net proceeds among his siblings. The testimony of George Dawes and Ernest Beline permits an inference of Decedent's faith in Defendant. We conclude there was a confidential relationship between Decedent and Defendant. *Compare Harlan v. Bishoff*, 649 S.W.2d 230, 231–32 and 233[5] (Mo.App. 1983); *Schoenberg v. Schoenberg*, 615 S.W.2d 111, 113–15 (Mo.App.1981).

Decedent's reliance may be inferred from the record. Had Defendant voiced an objection to Decedent's disposition of his property, as stated in the ledger, or expressed an unwillingness to perform the role laid out for him in the ledger, Decedent would have had the opportunity to make other arrangements. That Decedent did not make alternative arrangements is evidence of his reliance. *See Fix*, 847 S.W.2d at 767; *Strype*, 180 S.W.2d at 692.

After his father's death, Defendant repudiated his promise to divide his father's assets in the manner indicated in the ledger, choosing to retain all the property as his own thereby depriving his siblings of their beneficial interests in the assets. Defendant's denial of the existence of Decedent's will and his disavowal of knowledge about the ledger also constituted a violation of the trust placed in him. *Compare Imgrund*, 851 S.W.2d at 44–45 (decedent's widow, who was in sole possession of decedent's life insurance policies, denied the existence of life insurance for decedent's minor children).

Defendant calls our attention to the trial court's statement that it did not find that the execution of the real estate deed and the Holland note and deed and trust and the creation of the bank account were the result of fraud, duress, or undue influence on the part of Defendant. The question is not whether Defendant used undue influence to cause Decedent to arrange the various transfers of property. Rather, the question is

**13.** Although *Keller* predates *In Re Estate of LaGarce*, 487 S.W.2d 493 (Mo. banc 1972), and the revision of § 362.470 in 1977, the court's discussion of the relationship between Collison and the decedent in that case remains relevant.

whether Defendant breached his obligations once he acquired control over the property. *See Miller*, 872 S.W.2d at 658–59; *Thompson v. Williams*, 671 S.W.2d 442, 445 (Mo.App. 1984).

Two recent constructive trust cases bear discussion. In *Fix*, 847 S.W.2d 762, the disputed assets were a checking account and a savings account, each titled since 1964 in the names of the decedent Catherine Liggett and her sister Billie Fix. 847 S.W.2d at 764. Frank and Nicholas Fix, brothers of the decedent and Billie, sued Billie, requesting the trial court establish a constructive trust over the funds in the accounts and distribute the funds equally among the siblings. *Id.*

The court described as "undisputed" the evidence that Catherine intended the joint accounts to serve as testamentary dispositions. 847 S.W.2d at 767. However, the court concluded there was no evidence other than familial ties to establish a confidential relationship between Catherine and Billie regarding the disputed assets. *Id.* at 766. Thus, the court analyzed the evidence to determine if the decedent had relied on an agreement, express or implied, by Billie to divide the money with her brothers. Essential to this inquiry was "proof of Catherine's having made disposition of her property in reliance on an agreement by Billie, express or implied, to divide the money with her brothers and Billie's subsequent breach of the agreement." *Id.* at 767. The brothers' evidence consisted primarily of the testimony of Frank Fix and his wife Mary about Catherine's statements to them that she had placed Billie's name on the accounts to avoid probate and that she trusted Billie to divide the funds in the accounts evenly among the siblings. There also was evidence that after Catherine's death, Billie paid Frank $20,000 from one of the accounts to apply toward Catherine's debts and specific bequests and that Billie said to several family members that she was not going "to cheat them ... they're going to get their money." *Id.* at 767–68.

Assuming, without deciding, that all the evidence summarized above was admissible, the supreme court held it did not constitute clear and convincing evidence of Catherine's reliance on a promise by Billie to divide the funds in the accounts equally among the siblings. *Id.* at 768.

In *Estate of Hayward*, 884 S.W.2d 10 (Mo. App.1994), the decedent had titled some $500,000 worth of bank accounts, bonds, and stock in joint accounts with her niece, Esther Gibson, whom the decedent named as personal representative in her will. *Id.* at 11. Several beneficiaries under the decedent's will brought an action for discovery of assets against Gibson. *Id.* at 12. The trial court decreed the disputed assets to be part of the probate estate of the decedent and made these findings: the decedent intended the jointly titled assets be divided by Gibson according to the will; the decedent had instructed Gibson to divide the joint assets according to the will; Gibson had caused the decedent to believe she would divide the assets according to the will. *Id.* at 12–13.

The appellate court reversed the trial court judgment. Although there was "abundant" evidence that the decedent intended that Gibson divide the assets according to the will, *Id.* at 16, the court pointed out that under the law of joint accounts (§§ 362.470.1 and 369.174.1, RSMo 1986), as construed in *Estate of LaGarce*, 487 S.W.2d 493, and *Maudlin v. Lang*, 867 S.W.2d 514 (Mo. banc 1993), ownership of the assets vested in Gibson, the account survivor, absent a showing of fraud, undue influence, mental incapacity, or mistake. 884 S.W.2d at 13–14.[14] Because there was no evidence of undue influence, mental incapacity, or mistake, the court's review focused on whether the trial court erred in imposing a constructive trust based on fraud. *Id.* at 14.

The court summarized the relevant evidence:

"Based upon Mrs. Hayward's 1974 statement to her attorney, we may conclude that Mrs. Hayward had been counting on Mrs. Gibson since 1974, or earlier, to divide the funds. In 1974, Mrs. Hayward was apparently confident Mrs. Gibson would 'divide the funds.' We do not, however, know the precise basis of Mrs. Hayward's confidence that Mrs. Gibson would

---

**14.** The court and the parties in *Estate of Hayward* treated the stocks and bonds the same as they did the bank accounts. 884 S.W.2d at 13 n. 3.

divide the funds. The statement that Mrs. Gibson would divide the funds could conceivably have been based on mere hope or assumption that Mrs. Gibson would divide the funds, rather than on any communication.... Given [the *Fix*] standard, we conclude that the trial court could not reasonably have had the requisite degree of certainty that such a communication actually took place."

884 S.W.2d at 16. Thus the court rejected a conclusion that there was "clear proof of an express or implied promise by the account survivor which has been breached." *Id.* at 17.

In our case, as was the case in *Fix*, the testamentary nature of Decedent's arrangements is undisputed. And, as was the case in *Estate of Hayward*, the evidence is abundant about Decedent's intention that Defendant divide the property among himself and his siblings. In *Fix* and *Estate of Hayward*, as in the case before us, there was evidence of each decedents' reliance on the respective defendants to divide the assets.

However, the instant case also differs significantly from *Fix* and *Estate of Hayward*. In contrast to the court's conclusion in *Fix*, we have determined that there was a confidential relationship between Decedent and Defendant. Moreover, unlike the situation in *Fix* and *Estate of Hayward*, the evidence in our case is clear and convincing that Defendant agreed to divide the assets according to Decedent's wishes as recorded in the ledger.

We reject Defendant's Point I challenge to the sufficiency of the evidence. The trial court did not err in imposing a constructive trust and ordering Defendant to deliver the assets to the successor personal representative.[15]

We affirm the judgment of the trial court.

PARRISH, C.J., and MONTGOMERY, J., concur.

---

**15.** A constructive trust arises in favor of Plaintiffs, and Defendant's obligation as a "trustee" is to surrender the property to them. *Suhre*, 123 S.W.2d at 17. In the interest of orderly administration of Decedent's estate, the court properly ordered Defendant to surrender the assets to the successor personal representative.