657 S.W.2d 366 (1983)
In re the MARRIAGE OF Donald E. HARRISON, Jr., and Susan Marie (Harrison) Carter,
Donald E. HARRISON, Jr., Petitioner-Respondent,
v.
Susan Marie (Harrison) CARTER, Respondent-Appellant.
No. 12854.
Missouri Court of Appeals, Southern District, Division Two.
August 29, 1983.
*368 Devon F. Sherwood, Sherwood, Honecker & Bender, Springfield, for respondent-appellant.
Donald E. Harrison, Jr., pro se.
HOGAN, Judge.
This is a dissolution of marriage (divorce) case. As usual the only question is whether the trial court fairly and correctly apportioned the parties' marital property as required by former § 452.330, RSMo 1978.[1] The scope of our review is dictated by Murphy v. Carron, 536 S.W.2d 30, 32[1-3] (Mo. banc 1976).
The petitioner (Don) and respondent (Susan) were married February 14, 1975. Susan was then 23 years of age. Don, by our calculation, was 25. Susan had been married before and was the mother of a male child, Troy. She had, and has Troy in lawful custody under the provisions of her first decree of divorce. Troy is about 13 years of age at this writing. Don and Susan became parents of a female child, Ginger, now about 3 years of age. Susan has been awarded principal custody of the parties' daughter, and no issue as to child custody is presented. Nevertheless, it is to be borne in mind that Susan is a 31-year-old mother who has two children to rear.
The parties' marriage has been unhappy and unlucky. At the time they were married at Joplin, Don was attending a local college. Susan was also attending the college, "working at various parttime [sic] jobs." As we follow the record, the parties were separated after they married but were still living in Joplin. Don's version of the cause of their separation was that he "never [has] had the right attitude toward marriage." Susan maintained they separated because Don was "selling marijuana [and] it did not fit into my way of life."
In June 1976, Don decided to "start a new life." He and Susan moved to Casper, Wyoming. Both found employment. In May or June of 1977, Don's employer, a finance company, transferred him to Springfield, Missouri. Don quit his job in February or March of 1978; Susan thereupon became the sole wage earner. In June, Don found employment in Kansas. He and Susan moved to Lawrence, and Don commuted to his employment in Topeka.
At this timeJune of 1978Don and Susan both owned motorcycles. While they were riding their motorcycles in Topeka, Susan was struck by a passing motorist. She sustained severe and permanent injuries. No technical medical proof was presented, but Susan described the injury thus: "I received a multiple broken left femur, I received a medulla oblongata which is supposedly, is a brain stem injury, I received cuts, bruises, brain damage and general injuries." She was hospitalized at the Kansas University Medical Center, where she remained "in a coma" for about a month. By the middle of August, she had recovered sufficiently to be transferred to a rehabilitation facility in Topeka. She remained there until September 12.
Susan's accident led the parties to claim damages for personal injury and in November 1978, they received the sum of $50,000 in settlement of their claim. After legal fees were deducted, they realized the sum of $37,800. Neither Don nor Susan could recall the exact amount, but it is clear from the record that most of the proceeds of this settlement went to purchase a house in Topeka. Don testified the Topeka property was worth $60,000, subject to an encumbrance in the amount of $22,182.68. For some time, Don and Susan lived in this house, but after they moved from Topeka they let the house for $460 per month. The monthly "payment" on the house is $321. *369 The Kansas property is "jointly owned" and is one of the parties' principal assets.
The evidence was, from both parties, that after the Topeka house was purchased, they filed a joint petition in bankruptcy. We have no record of any discharge before us, but Don has personally assured the court that he and Susan were lawfully discharged. While we have some reservation about the time the petition was filed, the purpose of the proceeding is clear. As counsel put his affirmatively answered question to Susan, the bankruptcy proceeding "eliminated all bills associated with the accident and what other minor bills [the parties] had at that time." So much, then, for Kansas University Medical Center and "minor" [lesser] creditors.
At some time after the accident, Don decided to leave his employer in Topeka because he "felt there was not a whole lot of room for advancement there ... so [he] decided to ... sacrifice a little bit [and] continue my education drawing the GI Bill...." The parties moved to Warrensburg where Don finished his studies and was awarded a B.S. degree in electronics.
While Don and Susan were living in Warrensburg, Susan applied for disability benefits pursuant to that part of Title II of the Social Security Act now codified as 42 U.S. C.A. § 423(c)(1)(A) and 42 U.S.C.A. § 402(d)(2). As one would expect, she encountered administrative intransigence, but finally received an award of disability benefits in the amount of $950 per month. This entitlement is based on Susan's blindness and the dependency of her two children. See generally 70 Am.Jur.2d, Social Security and Medicare § 58, § 59 (1973). Susan's award of benefits was delayed and when she finally received a check, $11,071 in "back benefits" had accrued. This amount was deposited in a joint savings account. Some part of the amount representing "back benefits" was used to purchase a house in Carl Junction where the parties lived at the time they finally separated. The purchase price of this house was "42 or 45" thousand dollars, according to Don. Susan's memory of the transaction was vague, but she believed that most of the "down payment" on this house came from her "back benefits." Don's typewritten estimates of value, received without objection, indicate the value of the Carl Junction property is $42,000, that it is subject to an encumbrance in the amount of $36,890 and the monthly installment payment on the mortgage is $448. Such, in capsule, is the nature of the case before us.
In this court, Susan's counsel has briefed one comprehensive point, the substance of which is that in view of the gross disparity between the parties' capacity to work and earn, the division of marital assets is unfair and inequitable. We must agree.
Other arguments have been suggested, or suggest themselves. We have doubt of Susan's ability to rear her children single-handed, but, of course, no crowd of suitable alternative custodians stepped forward, and Don enthusiastically agreed to Susan's having custody. The trial court had little or no alternative. Don did invoke his privilege against self-incrimination, and he might have been refused affirmative relief as a sanction. See Geldback Transport, Inc. v. Delay, 443 S.W.2d 120, 121 (Mo.1969). No sanction was invoked in the trial court, however, and we cannot convict a trial court of error never suggested to it. Lincoln Credit Co. v. Peach, 636 S.W.2d 31, 36 (Mo. banc 1982), appeal dismissed ___ U.S. ____, 103 S.Ct. 711, 74 L.Ed.2d 942 (1983). The distribution of personalty may be unfair, but our only inquiry into the distribution of marital property is whether the division is so disproportionate as to amount to an abuse of discretion or an erroneous application of the law. In re Marriage of Schulte, 546 S.W.2d 41, 47 (Mo. App.1977). On the record presented, we can discern neither an abuse of discretion nor an erroneous application of the law in distributing the personalty, separate or marital. The distribution of realty is another matter.
In any realistic view of the facts, the parties have only two real assets, the house at Carl Junction and the house at Topeka. The trial court ordered the sale of the two *370 parcels of property and further ordered that the proceeds be divided equally. In effect, the trial court has ordered a partition. We do not say, nor intend to hold by indirection, that such a disposition exceeded the trial court's authority under former § 452.330. We are convinced that in ordering the real property sold and the proceeds divided equally, the court erroneously applied the law to the facts.
It has never been supposed that the factors or considerations enumerated in § 452.330.1 were exclusive. In re Marriage of Heddy, 535 S.W.2d 276, 281 (Mo.App. 1976). As the court held in that case, the statute gives the trial court great flexibility and far-reaching power in dividing the marital property so as to accommodate the needs of the parties upon dissolution and there is no formula respecting the weight to be given the relevant factors which a court may consider. See: Fields v. Fields, 643 S.W.2d 611, 617[9] (Mo.App.1982); In re Marriage of Schulz, 583 S.W.2d 735, 741[3] (Mo.App.1979); McLerran v. McLerran, 562 S.W.2d 710, 713 (Mo.App.1978). Even if it were otherwise the phrase "economic circumstances," which is part of the language of § 452.330.1(3), is broad enough to include the parties' capacity to work and earn.
So far as the record shows, Don is a 34-year-old male in robust general health. He has a readily marketable skill. Susan is not as fortunate. We are not medical experts and cannot know how, or to what extent, an individual person's motor, sensory and cognitive functions are affected by a "brain stem" injury. Nevertheless, as a result of the injury, Susan's sight has diminished to the point that she is "legally" blind but not completely sightless. Her sight is limited to the center and a small part of her normal visual field "to the right." She cannot distinguish nor identify printed letters or numerals unless they are "large." Don testified that her daily activities include "[c]are and upkeep [of] the children... does a real fine job of keeping the house clean and neat ... [and] does shopping with help." All the same, it is apparent that Susan's motor and sensory functions have been gravely impaired. She testified that she is clumsy and that her housekeeping ability has been diminished.
In dividing the marital property, the trial court seems to have acted in the belief that because Susan's monthly entitlement approximated Don's monthly income, there was no reason to anticipate Susan's need for maintenance. Don was ordered to pay $1 per year as nominal maintenance, thus preserving the jurisdiction of the court. Such an award overlooks the uncertainty of the future of the disability benefits program and the statutory intent that the anticipated future needs of a dependent spouse be met by a proper apportionment of marital property, rather than an award of maintenance, to the extent practicable. Spicer v. Spicer, 585 S.W.2d 126, 129[3] (Mo. App.1979).
We are not remitted to personal observation to know that the SSI disability program faces an uncertain future. In 1981, the G.A.O. reported that as much as $2 billion annually in social security disability payments were being made to 584,000 individuals who were ineligible. The reaction was such that in April 1983 the G.A.O. reported that many people with severe physical and mental impairments have apparently had their entitlements terminated. See 69 A.B.A.J. 948 (1983).
There is thus a logical basis, as well as a legal reason, to accept Susan's suggestion that she be awarded the Kansas property. She testified on trial that she wished to move back to Kansas to continue her efforts at rehabilitation. We do not accept her plan as altruistic; in 1980 the Congress amended 42 U.S.C.A. § 425 to continue payment of disability benefits to those who are actively trying to rehabilitate themselves. Even so, her future attempts at rehabilitation are in both parties' interests. If she continues her efforts at rehabilitation, Don is relieved of the necessity of paying a substantial award of maintenance. If Susan's health deteriorates to the point she is no longer self-sufficient, the Kansas property will furnish a source of income. It is *371 possible that she may acquire a marketable skill.
The obvious question then becomes: Why not award all the marital property to Susan? The direct answer is that we must take some account of the federal statutes and regulations which often impinge upon allocations of marital property even though the division is fair and equitable if one looks solely to the provisions of § 452.330. In particular we must realize and bear in mind that dissolution of marriage following a long period of inflation, will quite likely be a taxable event under the "rule of equivalence" established by United States v. Davis, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962). Certainly any extended discussion of the tax consequences of dissolution is well beyond the scope of this opinion and the expertise of this court. The subject has been thoroughly discussed elsewhere.[2] Further, we decline to speculate upon the 1981 amendment of § 452.330, although we understand the amendment was designed to minimize the impact of Davis on Missouri dissolutions after the manner of the Kansas statute, K.S.A. § 23-201(b). See Stern and Sellers, supra, 297-302. This petition was filed before the amendment of § 452.330 became effective September 28, 1981; statutes operate prospectively only, in the absence of a compelling legislative indication that they are to apply retroactively. Lincoln Credit Co. v. Peach, supra, 636 S.W.2d at 34, appeal dismissed ___ U.S. ____, 103 S.Ct. 711, 74 L.Ed.2d 942.
Further, the order to sell the marital realty in this case was all too obviously suggested in reliance on Rev.Rul. 81-292, 1981-2 C.B. 158-159, 1981-50 I.R.B. 11, wherein IRS ruled that an approximately equal division of the total value of jointly owned property under a divorce settlement agreement in a noncommunity property state is a nontaxable division, and the basis and holding period of each asset is the same as when the property was jointly owned. Inasmuch as transfers pursuant to a settlement or by decree are both "exchanges" within the compass of Section 1001(a) of the Internal Revenue Code, it may be extrapolated that the proceeds of the sale ordered here would be nontaxable.
The tax consequences of a dissolution are a factor to be taken in consideration in approving a property settlement or ordering a division of marital property. In re Marriage of Beck, 631 P.2d 282, 285[3] (Mont.1981); Wahl v. Wahl, 39 Wis.2d 510, 159 N.W.2d 651, 658-659[9] (1968). However, the burden of showing adverse tax consequences of a decree must ordinarily be established with some particularity on trial if those consequences are to be considered on appeal. In re Marriage of Kennedy, 51 Or.App. 15, 625 P.2d 654, 658[3-5] (1981). We have the view that the tax consequences to Don have received consideration beyond that deserved, probably because of the trial court's wholesale adoption of his proposed findings of fact. We bear in mind that the 1981 amendment to § 452.330 may obviate the principles we consider, if that amendment "works." In re Marriage of Engle, 293 Or. 207, 646 P.2d 20 (1982). The efficiency of the amendment to § 452.330 must be supplied by a decision of our Supreme Court, which, we take it, will at some point authoritatively construe the amendment. See Engle, supra, 646 P.2d 23-26. Of course, the amendment does not apply to this case, and no such construction is required.
The point of all this discussion is this: It is desirable to avoid an apportionment of marital property so retributive that one or the other spouse is required to resort to bankruptcy or is burdened with an insupportable tax liability. On the other hand, the law requires provision for a potentially disabled spouse by award of marital property, if that is practicable. Susan both wants and needs the Kansas property. Don cannot *372 again be discharged in bankruptcy for another year, but he might again be eligible before any interstate remedy could be effectively utilized. The Kansas property cannot be called a "home"; it is probably a capital asset, and if it has appreciated, the gain to Don, if any, will likely be treated as ordinary income rather than a capital gain. Stern and Sellers, supra, at 308 and n. 100. He should not be denuded of all assets with which to defray a possible tax liability. His needs can be met, in part, by sale of the Carl Junction property.
As a postlude, we wish to make it clear that we are dealing with statutes which have been modified. Further, we would emphasize most strongly that we have applied the law to the peculiar facts of the case, sua sponte, and the opinion should be limited to its facts.
It is therefore ordered that the Missouri property described on page 11 of the court's findings and order, be awarded to Donald E. Harrison, Jr., petitioner herein, and that he assume the indebtedness on that property. It is further ordered that the Kansas property, also described on page 11 of the court's findings and order be awarded to Susan M. (Harrison) Carter, defendant herein, and that she assume the indebtedness on the Kansas property. Otherwise, the decree is in all respects affirmed, and the cause is remanded with directions to modify the said decree as just above ordered.
MAUS, P.J., and PREWITT, J., concur.
NOTES
[1] References to statutes and rules are to RSMo. 1978 and Missouri Rules of Court (13th ed. 1982), except as otherwise noted.
[2] See MoBar CLE Series, Family Law § 5.60 (collating authorities) and Chapter 20 (addressing the tax consequences of dissolution generally) (3rd ed. 1982); Stern and Sellers, Property Settlements Upon Divorce: Yours, Mine and the Commissioner's, 48 U.M.K.C.L.Rev. 293 (1980); Gunn, The Federal Income Tax Effects of the Missouri Version of the Uniform Divorce Act, 1974 Wash.U.L.Q. 227; Annot., 51 A.L. R.3d 461 (1973).