In re the MARRIAGE OF GILMORE.

Patsy Ann GILMORE, Petitioner–
Appellant,

v.

Edward Merle GILMORE, Respondent–
Respondent.

No. 20798.

Missouri Court of Appeals,
Southern District,
Division Two.

May 2, 1997.

Kay A. Van Pelt, Springfield, for appellant.

Susan S. Jensen, Springfield, for respondent.

SHRUM, Judge.

Patsy Ann Gilmore (Wife [1]) appeals from a judgment dissolving her marriage to Edward Merle Gilmore (Husband), claiming an inequitable division of property resulted from the trial court's mischaracterization, as Husband's nonmarital property, of certain real estate parcels, notes secured by realty, and tangible personal property items. We affirm in part, reverse in part, and remand with directions.

## FACTS

The parties married June 21, 1982; their final separation was August 17, 1993. Trial began August 30, 1994, upon which date Wife was 54 years old and Husband was 61. No children were born of the marriage.

Wife's employment history included factory and restaurant work. At the time of trial she worked seven days a week at a nursing home where she earned $5.25 an hour. Her formal education was through the ninth grade with no graduate equivalency degree. Wife had several health problems: disc disease, osteoporosis, migraine headaches, and a pinched nerve in her elbow.

Husband worked for Hamby's Steak House in Springfield for 34 years. His employment ended with an on-the-job injury in 1984 when, during a robbery of the restaurant, he was struck on the head with a claw hammer. He received workers' compensation benefits of $42,500, including a lump sum payment of $28,900 and weekly payments totaling $13,600. Adjudged disabled by the Social Security Administration, he received monthly social security disability benefits of $900, which continued as of the date of the trial.

Before marriage, each party owned real and personal property. Wife's real estate, a home at Nixa, Missouri, was subject to a lien of approximately $14,000 in favor of the Farmers Home Administration (FmHA). Within 60 days after marrying, Wife sold her real estate for $32,000, receiving $2,000 down with the balance paid by the buyers' note for $30,000 secured by a first deed of trust. Both Husband and Wife were payees on the note and beneficiaries on the deed of trust. To remove the FmHA's lien, Husband used $12,176.81 of his pre-marriage money and Wife used $1,000 of her savings. Wife's oth-

---

1. Although their marriage has been dissolved, for convenience and clarity we refer to the parties as Wife and Husband.

er pre-marriage assets were a 1969 or 1970 Oldsmobile automobile valued at $150, household furnishings, and two bank accounts.

Husband testified that, as of the date of marriage, he owned real and personal property with a total value of $351,000, including a note secured by a deed of trust on 2325 South Porter, Joplin, Mo., balance due of $15,000; a note secured by a deed of trust on 806 Pennsylvania, Joplin, Mo., balance due of $27,500; the Riverside Motel, Brunswick, Mo., sold under a contract for deed, balance due of $162,000; Evelyn Kerns' note and deed of trust, balance due of $15,000; balance in account at Commerce Bank, $18,000; a coin collection worth $7,500; and $5,000 cash, kept in a safe in his residence. Husband's only pre-marriage debt was a note on the Riverside Motel with a balance of "$17,000 or $18,000."

Explaining his pre-marriage accumulation of assets, Husband testified that over the years he had bought and sold real estate as a "kind of hobby," and that, although he had worked many years at the restaurant for modest wages, he had once owned "as much as 40 houses free and clear." Husband testified he had always lived "frugally" and he never had a credit card. Before and after marrying, Husband kept as much as $37,000 cash in his safe from which he generally paid his bills, and he often used cash for investments. Consequently, he had few canceled checks or other documents to aid in tracing his business activities. Husband explained that each time he took money from the safe, he left a note stating the amount he took or the amount remaining.

Throughout the marriage, Husband kept his business checking account at Commerce Bank, maintaining the account only in his and his daughter's names. Husband and Wife had a joint checking account.

During the marriage, most of Husband's pre-marriage notes and contracts for deed were paid off, and Husband used the proceeds to buy real and personal property and make investments. Most of the property acquired during the marriage was titled in Husband's name alone, although on at least one occasion he titled real estate in his son's name. One parcel of realty, 1515 North Hampton in Springfield, purchased with money given Husband by his former employer as a Christmas gift, was originally titled in Husband's and Wife's names. Two years later, Wife conveyed her interest to Husband. Husband testified, "We were keeping our accounts separate and everything and she acknowledged that this was my house and because her name had appeared on it she gave me a release...."

Wife testified that when they married, Husband told her he had sold all his assets and given the proceeds to his children. She said that when they married she "[didn't] know what [property] he had. I never seen none of it. All I've ever heard is talk. If you can't see nothing, talk is just clear air." Wife said Husband never gave her any cash during the marriage, he was "very controlling," and she generally "kept [her] mouth shut" because that made Husband "easier to live with." Wife did not have the combination to the safe Husband kept at the family residence and she never was permitted to see inside it.

Regarding Husband's numerous transactions during the marriage, she testified, "Merle never give me the papers to sign that were filled out. They were always blank when I signed them.... That's the way he did business." She said Husband told her "several times" that "the reason he didn't put my name on the mortgages and ... deeds was because, if he did, I would get three-fourths and the state would already give me half."

Wife's primary effort at trial was to identify property—realty, notes secured by realty, and tangible personalty—acquired during marriage and to demonstrate her contribution to their acquisition while much of Husband's evidence focused on tracing proceeds from his pre-marriage property into those properties in order to show they were non-marital.

Of the contested properties, the trial court characterized two parcels of lake realty and

associated personalty (valued at $24,636) as marital, awarded them to Husband, and ordered Husband to pay Wife $12,318 as a set-off. The trial court also ordered Husband to pay Wife $6,646.38, an amount it characterized as the "net proceeds" from the sale of Wife's pre-marriage house, monthly maintenance of $500, and attorney fees.

The trial court classified most of the contested properties as Husband's nonmarital property. In each of six points on appeal, Wife contends the trial court's classification was erroneous and an unjust distribution resulted. She argues Husband did not present clear and convincing evidence to rebut the statutory presumption that the contested properties, all acquired during the marriage, were marital.

## APPLICABLE LAW

At issue is the trial court's application of Section 452.330,[2] which governs the division of property in a dissolution action. Relevant portions of the statute provide as follows:

"1. In a proceeding for dissolution of the marriage ... the court shall set apart to each spouse his nonmarital property and shall divide the marital property in such proportions as the court deems just after considering all relevant factors including:

"(1) The economic circumstances of each spouse at the time the division of property is to become effective ...;

"(2) The contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker;

"(3) The value of the nonmarital property set apart to each spouse;

. . . .

"2. For purposes of sections 452.300 to 452.415 only, "marital property" means all property acquired by either spouse subsequent to the marriage except:

"(1) Property acquired by gift ...;

"(2) Property acquired in exchange for property acquired prior to the marriage or in exchange for property acquired by gift ...;

. . . .

"(5) The increase in value of property acquired prior to the marriage or pursuant to subdivisions (1) to (4) of this subsection, unless marital assets including labor[ ] have contributed to such increases and then only to the extent of such contributions.

"3. All property acquired by either spouse subsequent to the marriage and prior to a decree of legal separation or dissolution of marriage is presumed to be marital property regardless of whether title is held individually or by the spouses in some form of co-ownership.... The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection 2 of this section.

"4. Property which would otherwise be nonmarital property shall not become marital property solely because it may have become commingled with marital property."

The showing required under Section 452.330.3 to rebut the marital property presumption must be made by clear and convincing evidence. *In Re the Marriage of Johnson*, 856 S.W.2d 921, 925[4] (Mo.App. 1993). " 'For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.' " *In Re Estate of Dawes*, 891 S.W.2d 510, 522 (Mo.App.1994) (quoting *In the Interest of M.J.A.*, 826 S.W.2d 890, 896 (Mo.App.1992)). There need not be one single event that "instantly tilts the scales." *Estate of Dawes*, 891 S.W.2d at 522. The trial court may be clearly convinced of the affirmative of a proposition even though it has contrary evidence before it, and evidence

**2.** Unless otherwise indicated, all statutory references are to RSMo 1994.

in the record that might have supported a different conclusion does not necessarily demonstrate that the trial court's determination is against the weight of the evidence. *Id.* at 523.

## STANDARD OF REVIEW

Appellate review of a dissolution of marriage judgment is governed by Rule 73.01(c) and the principles enunciated in *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976). *Mistler v. Mistler*, 816 S.W.2d 241, 245[1] (Mo.App.1991). Thus a judgment in a dissolution case must be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy*, 536 S.W.2d at 32[1].

When the trial court does not make a specific finding of fact, we consider the fact to have been found in accordance with the result reached by the court. Rule 73.01(a)(3); *Willyard v. Willyard*, 719 S.W.2d 91, 93 (Mo.App.1986). All evidence and permissible inferences therefrom are considered in the light most favorable to the trial court's decision, and all contrary evidence and inferences are disregarded. *In Re Marriage of Patroske*, 888 S.W.2d 374, 378[2] (Mo.App.1994).

■ The trial court, as sole judge of the credibility of witnesses, may believe all, part, or none of any witness's testimony. *Ritter v. Ritter*, 920 S.W.2d 151, 159[18] (Mo.App. 1996). This court defers to the trial court's assessment of credibility. *Willyard*, 719 S.W.2d at 93.

## DISCUSSION

*Point I: The "Wallace Deal"*

■ In Point I, Wife challenges the non-marital classification of seven parcels of realty known collectively as the "Wallace deal." In 1992 and 1993, Husband purchased, for $21,000, six lots in J.J. Weaver's Addition in Springfield, taking title in his name alone, and then "sold" them via contract for deed to one Wallace. In December 1992, Husband purchased property at 1317 North Lyon Avenue in Springfield for $23,000, which he likewise "sold" to Wallace. Additionally, Husband lent Wallace money to improve his properties so they could be rented, resulting in a total investment in the "Wallace deal" of $52,000.

By May 1994, Wallace had decided he could not afford the 1317 North Lyon property so he conveyed his interest in it to Husband via a quit claim deed. At trial Husband and Wife valued the Lyon property at $27,500, and Husband testified that Wallace still owed $21,000 on the contract for deed on the six Weaver's Addition lots.

Husband testified about the sources of most of the $52,000 invested in the "Wallace deal." Sometime around 1985, in satisfaction of the pre-marriage note on 806 Pennsylvania in Joplin, he testified, came $21,500. From the payoff in 1991 of a pre-marital note on 2325 South Porter in Joplin, Husband received $5,685. Husband testified repeatedly that these payoff amounts all went into the "Wallace deal," either directly or through an interim investment where Husband used money from the 806 Pennsylvania note to buy lots 26 and 27, Leisure Shores, in Stone County. Later, $28,000 came from the sale of the Stone County lots, a transaction that requires more discussion. From his daughter Husband borrowed $4,000 for the Wallace deal, which he repaid within three or four months, but he never identified the source of funds for repayment.

Regarding the interim investment in the Stone County lots, Husband testified that upon receipt of $21,500 from the 806 Pennsylvania note, he used a part thereof to purchase lots 26 and 27, which were titled in Husband's and Wife's names. Using money from an unspecified source, Husband purchased a mobile home for $4,150 and placed it on Lot 26. The only testimony about the value of the lots came from Wife, who said the purchase price of Lot 26 was $6,000 and Lot 27 was $4,000 or $5,000 and that she and Husband sold Lot 26 for $19,000 and Lot 27

for $9,000. Thus Husband's nonmarital contribution to the two lots was $10,000 [3] or 70.67 percent of the total investment of $14,150, which included the purchase of the mobile home.

The proportionate allocation of an increase in property value to the marital and nonmarital estates is illustrated in *Moritz v. Moritz*, 844 S.W.2d 109, 112[3] (Mo.App.1992). Applying the principles discussed in *Moritz*, Husband's 70.67 percent nonmarital portion of the $28,000 sale price of the two lots was $19,787.60.

Of the $52,000 investment in the "Wallace deal," Husband traced $19,787.60 from the payoff of the note on 806 Pennsylvania in Joplin through the Stone County lots to the "Wallace deal" properties, traced $11,500 directly from the 806 Pennsylvania payoff into the "Wallace deal" properties ($21,500 payoff less $10,000 interim investment in Lots 26 and 27), and traced $5,685 directly from the payoff of the 2325 South Porter in Joplin into the "Wallace deal." Thus Husband traced 71.10 percent of the investment into premarriage funds. Of the $48,500 value at trial of the "Wallace deal" properties, 71.10 percent or $34,483.50 is Husband's nonmartial property and the balance is marital.

Wife argues that Husband did not overcome another presumption, namely, that property jointly titled in the names of both spouses, as were the Stone County lots, is presumed to be marital property, absent clear and convincing evidence that the spouse who provided the consideration intended to make a gift to the other spouse. *See, e.g., In Re Marriage of Jennings*, 910 S.W.2d 760, 763[4] (Mo.App.1995); *Doll v. Doll*, 819 S.W.2d 739, 741[3] (Mo.App.1991).

In *Corbett v. Corbett*, 728 S.W.2d 550 (Mo. App.1987), the Western District of the Court of Appeals considered the presumption that arises from jointly titling assets in a case with facts similar to those in the instant case. In *Corbett*, the husband inherited about $29,000 from his mother. He put the money in

certificates in savings and loan associations and from time to time transferred the money from one association to another. He took several measures to segregate his money from the family funds. He testified he always maintained possession and control of the certificates and passbooks of the numerous accounts; neither Mrs. Corbett nor their children had access to the accounts. At one time, two accounts containing inherited money, each with a balance of about $2,000, were jointly titled in Mr. and Mrs. Corbett's names. After a family argument, Mr. Corbett ordered Mrs. Corbett to sign papers that removed her name from the accounts. Throughout the life of the certificates, Mr. Corbett frequently allowed the interest to accumulate in the accounts and then reinvested both the interest and the principal in other certificates. By the date of trial, the inherited money had increased in value to $35,000. The trial court classified the $35,000 as Mr. Corbett's nonmarital property, and the court of appeals affirmed. Concerning the presumption that arises from placing separate funds in joint tenancy, the court stated:

> " The evidence in this case is quite clear that over the years Mr. Corbett tightly controlled his separate property and, except for a small part, kept it in his own name or restored it to his own name. From that evidence the trial judge could readily perceive Mr. Corbett's intent to retain the bulk of his inheritance as his own and not to commingle it in such a way as to transmute the whole of the estate to marital property. Whether this intent not to commingle was sufficient to rebut the presumption was in the first place for the trial court, given the evidence of Mr. Corbett's tight control and insistence on reimbursement to the fund. We cannot say in this case that the evidence was insufficient to support rebuttal of the presumption."

728 S.W.2d at 555[5].

Much of what the court said of the evidence regarding Mr. Corbett's intent could

---

3. We use the purchase price of Lot 27 that is

more favorable to Wife.

be said of the evidence in the instant case about Husband's intent to retain control of the proceeds from the payoff of the note on 806 Pennsylvania in Joplin. The trial court could have concluded that Husband presented clear and convincing evidence to rebut the presumption that arose from the joint titling of the Stone County lots.[4]

*Point II: 1103 East Division Street; Fair Grove Property;* DeJarnette–Geronimo Drive Note

In Point II, Wife challenges the classification of two parcels of realty and one note secured by real estate; Husband argues he presented clear and convincing evidence that he acquired these assets using his nonmarital assets, namely, the Riverside Motel in New Brunswick, Mo., and a note from Evelyn Kerns.

■ According to his trial testimony, as of the date of marriage, Husband owed "$17,000 or $18,000" on the Riverside Motel. At some point during the marriage, the motel buyers defaulted on the contract for deed, still owing $135,000 under the contract. Husband sold the motel to other buyers for $125,000, this time conveying title by warranty deed in exchange for a note and deed of trust, an arrangement that required Husband to pay off the remaining $12,500 he owed. He and Wife borrowed this amount from a bank, pledging the motel note and deed of trust as security.

The buyers made payments to Husband for "the next 5 to 7 years," including one payment of $35,000. In 1987 the note was paid off, payment coming in the form of a $48,880 insurance check (fire had destroyed part of the motel), which Husband deposited in his business checking account at Com-

merce Bank, and a single payment from the buyers of $17,500.

Husband testified he used $13,500 of the motel insurance proceeds to purchase and renovate property at 1103 East Division Street in Springfield, which was titled solely in his name. Wife testified the purchase was funded from proceeds of a $20,000 loan made by Commerce Bank a few days before the purchase. Neither party supplied documentary evidence concerning the financing arrangements. We defer to the trial court's implicit assessment of credibility and conclude Husband's testimony rebutted the presumption that 1103 Division was entirely marital property.

However, Husband failed to prove 1103 Division was entirely nonmarital. Of the "$17,000 or $18,000" Husband owed on the motel as of the date of the marriage, $12,500 was paid with a loan on which both Husband and Wife were obligated and Husband admitted on cross-examination that "most of the time" the payments toward this debt came from the parties' joint checking account at Empire Bank. Moreover, Husband never identified the source of the payments that occurred between the date of marriage and the date of payoff.

Assuming Husband's pre-marriage motel debt was $18,000 and that it was paid entirely from marital funds, then the marital portion of the $152,000 Husband received during the marriage from the two sales of the motel was 11.84%. That percentage of the $28,000 value assigned to 1103 Division by Wife yields a marital share of $3,315.20 and Husband's nonmarital share of $24,684.80.

Husband used $24,500 of the motel insurance payment to purchase and renovate real-

---

4. In the argument under Point I and other points on appeal, Wife complains the trial court erred in admitting into evidence Respondent's Exhibit C, a document prepared by Husband and his lawyer to summarize the source of funds used to acquire assets during the marriage that Husband claimed were his separate property. At trial, Husband testified he "stood behind" Exhibit C and "adopted" it as his testimony. Wife contends Exhibit C was inadmissible and that it

contradicts Husband's testimony and contains information about which he never testified.

Any conflicts between Exhibit C and Husband's testimony were for the trial court to resolve. Moreover, Wife does not challenge the admissibility of Exhibit C in any of her points relied on. Issues raised only in the argument portion of a brief are not preserved for review. *Boatmen's Bank of Southern Missouri v. Foster,* 878 S.W.2d 506, 509 n. 4[5] (Mo.App.1994).

ty in Fair Grove, Missouri. After the initial buyers defaulted, Husband used an unspecified amount of money from an unidentified source to make "significant repairs and improvements ... to the house" at the request of a subsequent buyer. Applying the marital/nonmarital proportions of the source of funds, the Riverside Motel (11.84 percent marital and 88.16 percent Husband's nonmarital), we conclude that $21,158.40 of the $24,500 initial investment in the Fair Grove property was Husband's nonmarital share and $3,341.60 was marital. On remand, the trial court must find the cost of the second round of repairs to the property in order to determine the total investment. The court must also determine the source of the funds for the second round of repairs, assign a fair market value to the property as of the date of dissolution, and calculate the proportionate marital and nonmarital shares of that market value based on Husband's nonmarital monetary share of the total investment as a percentage of the total investment.

Citing Section 452.330.2(5) and *Meservey v. Meservey*, 841 S.W.2d 240 (Mo.App.1992), Wife argues that her contribution of labor entitles her to a proportionate share of the increase in value of the Fair Grove property. In her brief, Wife identifies evidence, if deemed credible, that satisfies each of the factors discussed in the text and footnotes of *Meservey*, 841 S.W.2d at 245–46[5–9]. However, Husband's and Wife's opinions of the value of this property differ—he says $33,000; she says $48,800—and the trial court made no finding of its value. Further, there is no evidence of the cost of the second round of repairs. Consequently, we cannot discern if there is an increase in market value above the total cost of the property that might arguably be attributable to Wife's claimed contribution of labor. Nor can we speculate on the trial court's resolution of witness credibility on this issue.

If on remand the trial court finds that there was an increase in the fair market value of the Fair Grove property above its total cost, then it shall consider whether there is sufficient credible evidence to persuade it to adjust Husband's nonmarital share of the Fair Grove property to reflect an apportionment to Wife of a share of the increase in its value. Any such consideration shall take into account the effects of factors including inflation and changing economic and market conditions.

In 1988 Husband sold the Geronimo Drive property to the DeJarnettes, receiving in exchange a note and deed of trust. Husband had purchased the property at a foreclosure sale; his total investment of $79,500 consisted of $59,500, with which he paid off the first, third, and fourth deeds of trust, and $20,000, which represented the second deed of trust he had acquired on the property at some earlier date during the marriage.

Husband testified the $59,500 came from the $35,000 payment on the Riverside Motel, $11,000 of the final $17,500 payoff on the motel note, and the $15,459.65 payoff of the Evelyn Kerns note. The sum is $61,459.65. However, we take Husband at his word that his outlay to extinguish the first, third, and fourth deeds of trust was $59,500, and that he used all of the payoff amount of the Kerns note, an asset he held prior to the marriage. Thus we calculate Husband invested $44,040.35 of the Riverside Motel proceeds in the Geronimo Drive property. Husband did not identify the source of his initial $20,000 investment in the Geronimo Drive property.

Husband's nonmarital share (using the 88.16 percent figure discussed above) of the $44,040.35 traceable to the Riverside Motel is $38,825.97. The payoff amount of the Kerns note increases Husband's nonmarital share of the investment in the Geronimo Drive property to $54,285.62, an amount equal to 68.28 percent of the total investment. At trial, the court valued the note on the Geronimo Drive property at $73,290.77. Husband's 68.28 percent nonmarital share is $50,042.94; the marital portion is $23,247.83.

As with the Fair Grove property, Wife argues her contribution of labor entitles her to a proportionate share of the increase in value of the Geronimo Drive property. Here, however, the record does not support

Wife's assertion, in that she refers to no evidence of the increase in value of the property that resulted from her efforts.

*Point III: The Barnett Note*

In December 1987, Husband lent the Barnetts $52,000, receiving in exchange a note secured by a deed of trust on two parcels of realty in Springfield. In its decree, the trial court valued the note at $35,959.46.

The record permits only limited review of whether Husband rebutted the marital property presumption. Husband testified $12,000 of the $52,000 came from his social security disability payments, at least $5,000 from his workers' compensation benefits, and the remainder from either the fire insurance proceeds on the Riverside Motel or from pre-marriage cash in his safe.

■■ Appellate courts of this state now prefer the "analytic approach," employing replacement analysis in the application of Section 452.330 to decide whether disability payments and workers' compensation benefits are marital or nonmarital. *Mistler,* 816 S.W.2d at 249. "The purpose of social security disability payments is to replace income lost due to the recipient's inability to work." *Weaks v. Weaks,* 821 S.W.2d 503, 506 (Mo. banc 1991). Any social security disability payments Husband used to fund the loan to the Barnetts were a replacement for income Husband would have received during the marriage and, hence, were marital property. Thus the portion of the Barnett note attributable to the social security disability payments should have been classified as marital.

The record does not reveal whether the portion of the loan traceable to workers' compensation benefits came from the weekly payments, intended as current income replacement, or from the lump sum payment, which must be apportioned according to what it replaced: current income loss or loss of

future earnings that would have accrued since the dissolution. *Pauley v. Pauley,* 771 S.W.2d 105, 107–10 (Mo.App.1989). On remand, the trial court shall make the appropriate determinations.[5]

Also on remand, the trial court shall determine the source of funds other than social security and workers' compensation payments used to lend money to the Barnetts. Any portion attributable to the Riverside Motel insurance proceeds shall be classified as in Point II: 88.16 percent Husband's non-marital and 11.84 percent marital. If Husband's evidence establishes that any cash from the safe was used other than Riverside Motel insurance, then Husband must establish the source of such cash. Once the trial court has determined the amount of nonmarital funds Husband contributed to the original $52,000 investment, it shall calculate Husband's nonmarital share of the $35,959.46 value assigned to the note at trial.

*Point IV: Hampton Avenue Properties*

■■ Point IV involves 1515 and 1516 North Hampton Avenue in Springfield, two houses purchased in 1985 to be rental properties. Husband testified he purchased 1515 North Hampton with Christmas money he received from his former employer Carl Hamby. Of the $7,835.34 purchase price of 1516 North Hampton, Husband said $7,500 came from the sale of his coin collection and the balance from cash in his safe originally derived from money in his business account at Commerce Bank or proceeds from the sale of tangible personal property he owned before marriage. This evidence rebuts the presumption that the two North Hampton properties were marital.

1515 North Hampton originally was titled in Husband's and Wife's names, and Wife now argues Husband did not overcome the presumption created by joint titling. We disagree. Two years after 1515 Hampton

---

5. Pointing to deficiencies in Wife's trial evidence, Husband argues she failed to carry her appellant's burden of demonstrating trial court error in the classification of the social security and workers' compensation payments. Not so. Wife has demonstrated error, i.e., she has shown the trial court erred in applying the law, given the state of the record on appeal. It is Husband's burden at trial to rebut the marital property presumption; his argument under this point on appeal is an attempt to shift that burden to Wife.

was purchased, Wife conveyed her interest to Husband. Of this conveyance, Husband testified that Wife "acknowledged that this was my house [and] she gave me a release...." As was the case with the Stone County lots discussed under Point I, we conclude Husband rebutted the presumption that arose as a result of the joint titling of the property.

Wife argues that her labor contributed to the increase in value the two Hampton properties enjoyed during the marriage. As was the case with the Geronimo Drive property discussed under Point II, Wife did not present evidence to satisfy all the requirements as stated in *Meservey*, 841 S.W.2d at 245–46[5–9]. At best, she offers evidence of her contribution of labor to produce marital property, i.e., rental income.

### Point V: The Oudin Note

Husband closed an individual retirement account with balance of $14,500 and used $11,000 to purchase a note made by the Oudins who had purchased real estate from one of Husband's relatives. Husband had established the IRA before the marriage and had contributed $2,000 to it during the marriage. As of the date of trial, the Oudin note was worth $9,120.

Husband's $2,000 contribution to the IRA during marriage and interest attributable to that amount are marital property; thus, the trial court erred in classifying the Oudin note in its entirety as Husband's nonmarital property. On remand, the trial court shall determine the marital and Husband's nonmarital shares of the IRA and then calculate the proportionate shares of the Oudin note as it was valued as of the date of the trial.

### Point VI: Tangible Personal Property

Wife's final point on appeal challenges the trial court's classification as Husband's nonmarital property of numerous items acquired during the marriage including furniture, appliances, and other household articles; boats, motors, and trailers; fishing equipment; lawn and garden equipment and tools; more than four dozen concrete animals and other lawn ornaments; a "large" collection of *Play-*

*boy* magazines; and one entry denominated simply "Miscellaneous old stuff."

Husband did not identify the source of funds by which a Mercury outboard motor, three electric trolling motors, and a Tanak outboard motor were acquired. Thus Husband did not rebut the marital property presumption and the trial court erred in classifying these items as Husband's nonmarital property.

Regarding the classification of all other tangible personal property items, Wife either conceded their nonmarital status at trial or Husband and Wife presented conflicting evidence about the source of funds for their acquisition. Applying our standard of review, we conclude the trial court did not err in its classification.

## DISPOSITION ON APPEAL

Wife requests we exercise our authority under Rule 84.14 to modify the judgment and divide equally those assets that we have concluded were erroneously classified as Husband's nonmarital property. She argues an equal division is appropriate because the trial court's division of property it classified as marital was essentially an even split. Husband argues that even if classification errors occurred, the distribution of property was not unjust and we should affirm. We decline each invitation.

Section 452.330.1 requires the trial court to divide marital property in proportions it deems just after considering certain factors, at least two of which—the economic circumstances of each spouse and the value of nonmarital property—are changed as a result of our decision. Moreover, for some of the assets, the trial court must take additional evidence. Thus we believe the trial court is in a far better position than we are to divide the marital property.

In dividing marital property, a trial court is vested with great flexibility and far-reaching power. *Woolridge v. Woolridge*, 915 S.W.2d 372, 376[4] (Mo.App.1996). A

court's division of property does not have to be equal; it must be fair and equitable and take into account the factors enumerated in Section 452.330.1 and any other relevant factors. *Mistler,* 816 S.W.2d at 252[8]. There is no formula assigning weight to the relevant factors. *In Re Marriage of Harrison,* 657 S.W.2d 366, 370[4] (Mo.App.1983). The term "economic circumstances" in Section 452.330.1 is broad enough to include the parties' capacity to work and earn. *Marriage of Harrison,* 657 S.W.2d at 370[5]. The law requires provision for a potentially disabled spouse by award of marital property, if practicable. *Id.* at 371[11]. Appellate courts interfere with a trial court's division of marital property only if the division is so unduly weighted in favor of one party that it constitutes an abuse of discretion. *See Lenger v. Lenger,* 939 S.W.2d 11, 14–15[7] and n. 1 (Mo.App.1997).

Here, Husband was adjudicated disabled by the Social Security Administration. Moreover, Husband's economic contribution to the assets acquired during marriage greatly exceed that of Wife. Considering the results of the injury to Husband and also his economic contribution to the property acquired during marriage, any judgment entered by this court via Rule 84.14 would not divide the marital property equally. Nonetheless, we are mindful that the trial court can best determine credibility of parties, their sincerity, character, and other trial intangibles which may not be shown by the record. *In re Marriage of Buchanan,* 882 S.W.2d 288, 289[2] (Mo.App.1994).

## CONCLUSION

We affirm the portions of the judgment classifying 1515 and 1516 North Hampton (Point IV) and the tangible personal property (with the exception of the five boat motors) (Point VI) as Husband's nonmarital property. The trial court's remaining classifications that are challenged on appeal are reversed and the cause remanded for the trial court to reclassify the property consistent with this opinion. To accomplish proportionate classification of the Fair Grove property, the Barnett note, and the Oudin note, the court may take additional evidence necessary to resolve issues identified in this opinion. Following reclassification, the court shall set apart to the parties their nonmarital property and divide the marital property.

MONTGOMERY, C.J., and PARRISH, J., concur.